1

**ATTORNEY ANTHONY BELL (SBN #349401)**

2

Superheroes At Law, P.C.
8383 Wilshire Blvd, Suite 935

3

Beverly Hills, California 90211
855-694-3762

4

info@superheroesatlaw.com
*Attorney for Plaintiff*

5

6

## UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

8

9

JEFFREY CARTER and DOES 1-20,
individually and on behalf of all others
similarly situated,

10

11

            Plaintiffs,

12

VS.

WILLARD L. JACKSON,

13

NICOLE T. BIRCH,

14

420 REAL ESTATE, LLC., a Texas limited
liability company doing business in the state

15

of California,
VICENT PETRESCU

16

aka VINCENT PETRESCU, and
TRUCROWD, INC. dba  FUNDANNA a

17

Delaware corporation doing business in the
state of California,

18

TRANSATLANTIC REAL ESTATE, LLC a

19

California limited liability company,
BANGI, INC. is a Nevada corporation doing

20

business in the state of California, and DOES
1-20

21

22

            Defendant.

23

24

25

26

27

28

) Case No.:
)
)
) **CLASS ACTION COMPLAINT:**
)
) **1. VIOLATIONS OF SECTION 17(A) OF THE**
) **SECURITIES ACT**
) **2. VIOLATIONS OF SECTION 10(B) OF THE**
) **EXCHANGE ACT AND EXCHANGE ACT RULE**
) **10B-5**
) **3. VIOLATIONS OF SECTION 5(A) AND (C) OF**
) **THE SECURITIES ACT**
) **4. VIOLATIONS OF SECTION 5(A) AND (C) OF**
) **THE SECURITIES ACT**
) **5. AIDING AND ABETTING VIOLATIONS OF**
) **SECTION 17(A) OF THE SECURITIES ACT**
) **6. AIDING AND ABETTING VIOLATIONS OF**
) **SECTION 10(B) OF THE EXCHANGE ACT AND**
) **EXCHANGE ACT RULE 10B-5**
**7. AIDING AND ABETTING VIOLATIONS OF**
**SECTIONS 5(A) AND (C) OF THE SECURITIES**
**ACT**
**8. VIOLATIONS OF SECTION 4A(A)(5) OF THE**
**SECURITIES ACT AND RULES 301(C)(2)**
**THEREUNDER**
**9. BREACH OF CONTRACT**
**10.FRAUDULENT MISREPRESENTATION**
**11BREACH OF FIDUCIARY DUTY**
**12. UNLAWFUL BUSINESS PRACTICE**
**13. NEGLIGENCE**
**14. CONVERSION**
**15. CIVIL CONSPIRACY TO COMMIT FRAUD**
**16. CONSTRUCTIVE TRUST OR EQUITABLE**
**LIEN**

## DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

|  | Page |
|---|---|
| PRELIMINARY STATEMENT | 4 |
| JURISDICTION, VENUE AND CHOICE OF LAW | 6 |
| PARTIES | 6 |
| a.   Plaintiffs | 6 |
| b.   Defendants | 6 |
| FACTUAL ALLEGATION | 9 |
| A. Shumake Explores Various Means to Raise Money through Securities Offerings | 9 |
| B. The Transatlantic Real Estate Offering and Misuse of Investor Proceeds | 11 |
| C. The 420 Real Estate Offering and Misuse of Investor Proceeds | 14 |
| D. Petrescu and TruCrowd Allowed the Offerings to Proceed Despite Warning Signs of Fraud | 16 |
| CLASS ACTION ALLEGATIONS | 20 |
| a.        NUMEROSITY (RULE 23(a)(1)): | 20 |
| b.        COMMONALITY (RULE 23(a)(2) and 23(b)(3)): | 21 |
| c.        TYPICALITY (Rule 23(a)(3)): | 22 |
| d.        ADEQUACY OF REPRESENTATION (Rule 23(a)(4)): | 23 |
| **FIRST CAUSE OF ACTION:** Violations of Section 17(a) of the Securities Act | 26 |
| **SECOND CAUSE OF ACTION:** Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 | 27 |
| **THIRD CAUSE OF ACTION:** Violations of Section 5(a) and (c) of the Securities Act | 28 |
| **FOURTH CAUSE OF ACTION:** Violations of Section 5(a) and (c) of the Securities Act | 30 |
| **FIFTH CAUSE OF ACTION:** Aiding and Abetting Violations of Section 17(a) of the Securities Act | 31 |
| **SIXTH CAUSE OF ACTION**: Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 | 33 |

| | |
|---|---|
| **SEVENTH CAUSE OF ACTION:** Aiding and Abetting Violations of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] | 34 |
| **EIGHTH CAUSE OF ACTION:** Violations of Section 4A(a)(5) of the Securities Act and Rules 301(c)(2) Thereunder | 35 |
| **NINTH CAUSE OF ACTION**: Breach of Contract | 37 |
| **TENTH CAUSE OF ACTION:** Fraudulent Misrepresentation | 38 |
| **ELEVENTH CAUSE OF ACTION:** Breach of Fiduciary Duty | 39 |
| **TWELVETH CAUSE OF ACTION** : Unlawful Business Practice | 41 |
| **THIRTEENTH CAUSE OF ACTION:** Negligence | 42 |
| **FOURTEENTH CAUSE OF ACTION:** Conversion | 43 |
| **FIFTEETH CAUSE OF ACTION:** Civil Conspiracy to Commit Fraud | 45 |
| **SIXTEENTH CAUSE OF ACTION:** Constructive Trust or Equitable Lien | 46 |
| PRAYER FOR RELIEF | 47 |
| JURY DEMAND | 49 |
| EXHIBIT 1 | |
| EXHIBIT 2 | |
| EXHIBIT 3 | |
| EXHIBIT 4 | |
| EXHIBIT 5 | |
| EXHIBIT 6 | |
| EXHIBIT 7 | |

Now comes the Plaintiff in the above-entitled action and says as follows:

The Plaintiffs, JEFFREY CARTER and DOES 1-20, individually and on behalf of all others similarly situated, brings this action against the Defendant, WILLARD L. JACKSON, NICOLE T. BIRCH, 420 REAL ESTATE, LLC., a Texas limited liability company doing business in the state of California, VICENT PETRESCU aka VINCENT PETRESCU, and TRUCROWD, INC. dba FUNDANNA a Delaware corporation doing business in the state of California, TRANSATLANTIC REAL ESTATE, LLC a California limited liability company, BANGI, INC. a Nevada corporation doing business in the state of California, and DOES 1-20, pursuant to the provisions of Rule 23, individually and in his representative capacity on behalf of a Class of all other persons who are similarly situated.

# I. INTRODUCTION

## PRELIMINARY STATEMENT

1.      The SEC originally brought an action to remedy two fraudulent crowdfunding offerings conducted by Defendants Robert Samuel Shumake. Jr. ("Shumake"), Willard L. Jackson ("Jackson"), and Nicole T. Birch ("Birch"). [1]

2.      The SEC allege that the issuers of the securities that were fraudulently sold to members of the public were Defendant 420 Real Estate, LLC ("420 Real Estate") and a now defunct company named Transatlantic Real Estate, LLC ("Transatlantic Real Estate").

3.      The SEC allege Transatlantic Real Estate and 420 Real Estate were raising funds through offerings on a crowdfunding platform hosted by Defendant TruCrowd, Inc. ("TruCrowd"). TruCrowd's CEO, Defendant Vicent Petrescu, aka Vincent Petrescu ("Petrescu"), was responsible for selecting which issuers could use TruCrowd's platform to conduct crowdfunding offerings. Under the SEC's crowdfunding regulations, Petrescu and TruCrowd served as gatekeepers and, as such, were responsible for taking measures to reduce the risk of fraud.

4.      The SEC allege Shumake and Birch offered and sold securities of Transatlantic

_____

[1] Exhibit 1: SEC Complaint

Real Estate from September 2018 through May 2019. Shumake and Jackson offered and sold securities of 420 Real Estate from May 2019 through June 2020.

5.      The SEC allege Shumake was the driving force behind both of the offerings, but he kept his participation secret in order to hide a past criminal conviction arising from a mortgage fraud scheme. Shumake convinced Birch to act as the chief executive officer and sole member of Transatlantic Real Estate and convinced Jackson to act in the same roles for 420 Real Estate.

6.      The SEC allege Shumake, along with Birch and Jackson, marketed both offerings as opportunities for investors to share in bountiful profits from the cannabis industry, by acquiring real estate and leasing it to companies engaged in the business of growing cannabis.

7.      The SEC allege Shumake, Birch, and Jackson made multiple false and misleading representations and omissions to investors in connection with the crowdfunding offerings. Among other things, they concealed Shumake's past criminal history and his leading role in both offerings. And to make matters worse, they diverted hundreds of thousands of dollars from the offering proceeds for their personal benefit. None of the money raised in either offering was used to acquire or improve cannabis real estate. None of the investors in either crowdfunding offering has received any return on their investment, and few investors have recovered any of the funds they invested.

8.      The SEC allege Petrescu failed to address red flags including Shumake's criminal history and involvement in the crowdfunding offerings, and otherwise failed to reduce the risk of fraud to investors.

9.      The SEC allege on January 02, 2023 the entry of final judgments against Nicole Birch, former CEO of crowdfunding issuer, Transatlantic Real Estate, LLC, SEC-registered crowdfunding portal, TruCrowd, Inc., and its CEO, Vincent Petrescu. was issued.

10.      Without admitting or denying the allegations of the complaint, Birch consented to the entry of the judgment permanently enjoining her from violating the registration provisions of Section 5 of the Securities Act of 1933 and the antifraud provisions of Section 17(a) of the Securities Act and Sections 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

thereunder. [2]

11.     Petrescu[3] and TruCrowd[4], without admitting or denying the allegations in the complaint, consented to the entry of the judgments permanently enjoining them from violating the crowdfunding rules of Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

12.     The judgments order: (i) civil penalties of $200,000, $9,700, and $97,500 against Birch, Petrescu, and TruCrowd, respectively; (2) disgorgement including prejudgment interest of $600,712 against Birch and $129,380 against TruCrowd; and (3) an officer and director bar against Birch.

13.     SEC Commission sanction Birch by suspending her from appearing or practicing before the Commission as an attorney.[5]

14.     SEC Commission also ordered the suspension of Petrescu from appearing or practicing before the Commission as an accountant.[6]

**II. JURISDICTION AND VENUE**

15.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and there is minimal diversity because Plaintiff and Defendant are citizens of different states.

16.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78aa(a)].

17.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because many of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of this district.

---

[2] Exhibit 2: Final Judgement as to Defendant Nicole T. Birch
[3] Exhibit 3: Final Judgement as to Defendant Vicent Petrescu
[4] Exhibit 4: Final Judgement as to Defendant Trucrowd, Inc.
[5] Exhibit 5: Order Instituting Public Administrative Proceeding pursuant to Rule 102E
[6] Exhibit 6: Order Instituting Public Administrative Proceeding pursuant to Rule 102E

18.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, have made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

## III. PARTIES

### A. PLAINTIFFS

19.     Jeffrey M. Carter is a natural person residing in Tulare, California and an investor in 420 Real Estate LLC.

20.     The true names and capacities of Plaintiffs Does 1-20, inclusive, are currently unknown to Plaintiff. Plaintiff will seek leave of this court to amend this complaint to reflect the true names and capacities of the DOES 1-20 Plaintiffs when their identities become known.

### B. DEFENDANTS

21.     **Robert S. Shumake**, resides in Bloomfield Hills. In December 2017, Shumake pled guilty to two misdemeanor violations of the Michigan Credit Services Protection Act, and on behalf of his business, to two felony counts of obtaining money by false pretense, for improperly taking upfront fees for mortgage audit services that he promised, but failed to deliver (*People v. Shumake*, et al., Mich. 46th Jud. Dist. (Feb. 15, 2017)). The presiding court sentenced Shumake to a probationary period of 18 months, during which time Shumake was forbidden to work in a position where he could have "direct control over, or access to, another person's money." Shumake ignored the terms of his probation sentence. Before his probation ended in May 2019, he conducted the Transatlantic Real Estate offering with Birch and set in motion the 420 Real Estate offering with Jackson. Shumake owns and controls Shumoja Media Group, LLC ("Shumoja"), a purported marketing services company, which received money in connection with the crowdfunding offerings.

22.     **Willard L. Jackson**, resides in Houston, Texas. Jackson serves as the CEO and the sole director of 420 Real Estate. Jackson previously served as a director of Bangi, Inc., described below. Jackson also held ownership interests in WLJ Group, LLC and Ebony Media Holdings, LLC, (collectively, the "Jackson Entities"). Jackson facilitated the payment of money from the 420 Real Estate offering to the Jackson Entities.

23.     **Nicole T. Birch**, resides in Gainesville, Georgia. Birch is a licensed attorney in

Georgia and has her own law practice, H.B. Associates P.C. ("H.B. Associates"). Birch has served as CEO and sole director of both Transatlantic Real Estate and Bangi, Inc. Birch facilitated the payment of money from the Transatlantic Real Estate offering to herself and to H.B. Associates.

24.     **420 Real Estate, LLC** is a Texas limited liability company formed in April 2019 with its principal place of business in Houston, Texas. 420 Real Estate purports to be a real estate company that specializes in the acquisition and leasing of properties that support the hemp industry. 420 Real Estate is owned by Willard Jackson. 420 Real Estate raised $888,180 through a crowdfunding offering between May 2019 and June 2020 ("420 Real Estate offering").

25.     **TruCrowd, Inc. dba Fundanna is** a Delaware corporation with its principal place of business in Chicago, Illinois. TruCrowd is an SEC-registered funding portal for crowdfunding offerings. TruCrowd hosted the crowdfunding offerings for Transatlantic Real Estate and 420 Real Estate through its platform.

26.     **Vicent Petrescu, aka Vincent Petrescu**, resides in Algonquin, Illinois. Petrescu, a licensed CPA, is the founder and CEO of TruCrowd. Petrescu granted Transatlantic Real Estate and 420 Real Estate access to TruCrowd's platform to conduct the crowdfunding offerings.

27.     **Transatlantic Real Estate, LLC,** was a California limited liability company formed in August 2018 with its principal place of business in Grosse Pointe Farms. Transatlantic Real Estate purported to be a real estate company that specialized in the acquisition and leasing of properties that support the medical cannabis industry. Transatlantic Real Estate raised $1,020,100 through a crowdfunding offering between September 2018 and May 2019 ("Transatlantic Real Estate offering"). According to the offering statement for the Transatlantic Real Estate offering, Birch was the one hundred percent owner, CEO, chairman, and sole director of the company. On July 9, 2021, Transatlantic Real Estate filed a Certificate of Cancellation with the California Secretary of State, which terminated its status as a limited liability company.

28.     **Bangi, Inc. ("Bangi")** is a Nevada corporation with its principal place of business in Grosse Pointe Farms. Bangi is a publicly traded company that purports to specialize in the acquisition and leasing of properties that support the cannabis industry. Bangi's common stock

trades in the over-the-counter market under the symbol "BNGI." According to Bangi's most recent SEC filing, Birch is the CEO of Bangi.

29.    The true names and capacities of Defendants DOES 1–20, inclusive, are currently unknown to Plaintiff. Accordingly, Plaintiff sues each and every DOE Defendant by such fictitious names. Each DOE Defendant, individually and collectively, is responsible in some manner for the unlawful acts alleged herein. Plaintiff will seek leave of this Court to amend this Complaint to reflect the true names and capacities of the DOE Defendants when their identities become known.

30.    Plaintiff alleges that at all times relevant to the events giving rise to this action, each and every Defendant was acting as an agent or employee of each of the other Defendants. Plaintiff further alleges that at all times relevant to those events, each and every defendant was acting within the course and scope of that agency or employment at the direction of or with the full knowledge, permission, or consent of each and every other Defendants was made known to, and ratified by each of the other Defendants.

## IV. FACTUAL ALLEGATION

### A. Shumake Explores Various Means to Raise Money through Securities Offerings

31.     Following his guilty plea, but before the end of his probationary period and the court order prohibiting him from having access to other people's money, Shumake began taking steps to raise money from the public to enter the cannabis industries. Ultimately, he pursued crowdfunding offerings as a means to raise funds.

32.    Crowdfunding offerings are governed by the securities transaction registration provisions of the Securities Act [17 U.S.C. §§ 77(a), *et seq.*] and Regulation Crowdfunding thereunder [17 C.F.R. § 227.100, *et seq.*]. From 2018 through 2020—the years relevant to this Complaint—these crowdfunding provisions allowed an unregistered offering of up to $1,070,000 through an intermediary, in this case, a funding portal registered under Rule 400 of Regulation.

33.    Crowdfunding issuers could offer and sell their securities through the intermediary's platform on the internet. Prior to the start of the crowdfunding offering, the issuer was required to file with the SEC a "Form C," and disclose certain information about the issuer and the offering through the Form C and offering statement. For instance, issuers relying

on the crowdfunding registration  exemption were required to disclose, among other information, the names of all the  issuer's officers, directors, and persons occupying a similar status or performing a  similar function; the purpose and intended use of the offering proceeds; related party transactions with the issuer's officers and promoters that are, in the  aggregate, in excess of five percent of the aggregate capital that the issuer seeks to  raise; and any material information necessary in order to make the statements made  not misleading, in light of the circumstances under which they were made.  Crowdfunding Regulation also requires that the funding portal post the offering statement for each issuer on its internet platform so that all prospective investors have access to the same information relating to the issuer's offering.

34.     In September 2018, Shumake enlisted Birch, an attorney with whom he was in a personal relationship, to form Transatlantic Real Estate, with Birch holding the positions of CEO and sole member. Shumake also convinced Birch to raise funds through a crowdfunding offering and to hide Shumake's involvement.

35.     Transatlantic Real Estate's mailing address was a UPS store in Grosse Pointe Farms, near where Shumake lived, rather than in Georgia where Birch lived.

36.     Shumake set up Bangi in November 2018, while he was working with Birch to conduct the Transatlantic Real Estate crowdfunding offering. Bangi's address at the time was the same UPS store in Grosse Pointe Farms that Transatlantic Real Estate used.

37.     According to its website, Bangi "acquires specialized assets including hemp and cannabis farms, dispensaries, commercial real estate, industrial real estate, and leases real estate to the multi-billion dollars and growing cannabis industry."

38.     Shumake regularly attended and participated in Bangi Board meetings, gave direction to the company's officers and directors, and conducted business on behalf of Bangi. Board minutes identify Shumake as the founder of Bangi. Bangi Directors and Shumake discussed his criminal history and its potential impact on prospective investors. Despite his involvement in the affairs of Bangi, Shumake elected not to serve as an officer or director of the company. Nor was he listed on Bangi's website, this was questioned by one of the Director Neil Parsan which effected his immediate resignation thereto.[7]

_____

[7] Exhibit 7: Email Communication of Dr. Neil Parsan

39.     Shumake explored the possibility of Bangi conducting an offering under SEC Regulation A+ [17 C.F.R. § 230.251, *et seq.*], which permitted higher fundraising amounts than those allowed under Regulation Crowdfunding.  Ultimately, an offering for Bangi never occurred.

40.     In April 2019, Shumake enlisted Jackson, a friend and Bangi director, to form 420 Real Estate, with Jackson as the CEO and sole member. Shumake convinced Jackson to utilize 420 Real Estate as a vehicle for raising funds through a crowdfunding offering (the "420 Real Estate offering"). Shumake also convinced Jackson to hide Shumake's involvement in the 420 Real Estate offering.

41.     Shumake discussed with Jackson his plans to use money raised through the 420 Real Estate offering to fund Bangi.

42.     Shumake's name was not on any of the offering documents for Transatlantic Real Estate or 420 Real Estate. Shumake, Jackson, and Birch all knew that the disclosure of Shumake's criminal past could hinder fundraising.  Therefore, they concealed Shumake's involvement, and Birch and Jackson falsely held themselves out as the sole persons with authority over the offerings.

**B. The Transatlantic Real Estate Offering and Misuse of Investor Proceeds**

43.     Shumake arranged for TruCrowd to serve as the crowdfunding portal for the Transatlantic Real Estate offering.

44.     Birch, with Petrescu assistance, wrote the Transatlantic Real Estate Form C and offering statement. Birch and Petrescu kept Shumake informed about the drafting process by copying him on substantive email discussions about the offering statement. Birch, Shumake, and Petrescu also each weighed in on the steps necessary to kick off and promote the Transatlantic Real Estate offering to investors.

45.     Transatlantic Real Estate filed the Form C and offering statement with the SEC on September 12, 2018. Birch signed the Form C as the company's sole officer.  The Form C and offering statement omitted any mention of Shumake's involvement in the company or the offering. Rather, to conceal Shumake's criminal record, his name did not appear on any of the documents associated with the Transatlantic Real Estate offering. Birch falsely held herself out as the sole person with authority over the company and the offering.

46.     Shumake and Birch knew that disclosure of Shumake's criminal past could hinder fundraising.

47.     According to the Transatlantic Real Estate offering statement, the company was a diversified investment vehicle that acquired and leased specialized real estate assets. Its strategy was to acquire industrial real estate that could be used as medical cannabis cultivation facilities.

48.     The Transatlantic Real Estate offering statement represented that the company was offering a maximum of 10,700 convertible notes for $100 each, and that each subscription consisted of a "15% convertible Note . . . that mature[d] eighteen months from the date of issuance, and, at [the] company's option, [was] convertible at a 10% discount into the public market."

49.     The Transatlantic Real Estate offering statement represented that, after expenses, the company intended to use the offering proceeds as follows: (1) $194,740 for marketing; (2) $97,370 for legal fees; (3) $584,220 for property improvement; and (4) $97,370 in administrative fees.

50.     The Transatlantic Real Estate offering statement contained several materially false and misleading statements, including the following:

    a.   Transatlantic Real Estate employed a senior management team that had significant experience in the real estate industry and sophisticated finance and capital markets expertise;

    b.   Transatlantic Real Estate had contingently acquired a 9-plus acre property with 80,000 Square Foot Green Houses located in California; and

    c.   Transatlantic Real Estate would use $584,220 of the proceeds for "property improvement."

    d.   Transatlantic Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital Transatlantic Real Estate intended to raise in the offering.

    e.   Transatlantic Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."  All of these statements were false and misleading.

51.     Transatlantic Real Estate never acquired any real estate and did not use any of the offering proceeds to purchase or improve any property.

52.     As for the management of Transatlantic Real Estate, Birch had no experience in the real estate industry or sophisticated finance and capital markets expertise and did not employ any individuals, let alone a "team" with such experience on behalf of Transatlantic Real Estate.

53.     The offering statement failed to disclose either Shumake's criminal record or that he would be actively involved in raising funds from investors and managing the company.

54.     Shumake co-managed Transatlantic Real Estate with Birch and was extensively involved in the company's strategic decisions. For instance, Shumake:

> f.    directed communications with current and prospective investors;
>
> g.    lined up a transfer agent for Transatlantic Real Estate;
>
> h.    helped prepare documents and promote the offering;
>
> i.    solicited Transatlantic Real Estate advertisements from third parties and drafted advertising scripts for social media; and gave directions to Birch as to the disbursement of investor money from Transatlantic Real Estate's bank account.

55.     From September 2018 through May 2019, Transatlantic Real Estate raised $1,020,100 from approximately 2,000 investors in multiple states through TruCrowd's platform. The convertible notes that Transatlantic Real Estate offered and sold to the investing public through TruCrowd were securities.

56.     Birch and Shumake diverted the investors' money for purposes unrelated to Transatlantic Real Estate, including hundreds of thousands of dollars transferred to Birch and her entity, H.B. Associates, and to Shumake and his entity, Shumoja.

57.     Shumake and Birch diverted $358,311–or 35% of the total offering proceeds—to Birch and her firm, H.B. Associates.

58.     Shumake and Birch diverted $304,709—or 30% of the total offering proceeds—to Shumake and his company, Shumoja.

59.     The Transatlantic Real Estate offering statement disclosed the possibility of related party transactions, but stated those transactions would be "consistent with the duties of the management of the Company to its shareholders."

60.     Birch and Shumake did not use any investor funds to buy or improve property.

61.     The Transatlantic Real Estate investors have not received any monetary return on their investment.

**C. The 420 Real Estate Offering and Misuse of Investor Proceeds**

62.     Shumake arranged for TruCrowd to serve as the crowdfunding portal for the 420 Real Estate offering and put Jackson in touch with Petrescu.

63.     Jackson knew little about crowdfunding and relied on Shumake to take the necessary steps for 420 Real Estate to conduct its crowdfunding offering.  Shumake told Jackson, a Bangi Director, about his plan to use the proceeds raised from the 420 Real Estate offering to fund Bangi.

64.     While Shumake was deeply involved in arranging the offering, he persuaded Jackson to hide Shumake's role with 420 Real Estate because of his criminal history.

65.     Petrescu and others participated in the drafting of the 420 Real Estate Form C and offering statement. Petrescu and others kept Jackson and Shumake informed about the drafting process by copying him on substantive email discussions about the Form C and offering statement.

66.     420 Real Estate filed its Form C and offering statement with the SEC on May 7, 2019. Jackson signed the Form C as the company's sole officer.

67.     The 420 Real Estate Form C and offering statement omitted any mention of Shumake's involvement in the company of the offering. Rather, to conceal Shumake's criminal record, his name did not appear on any of the documents associated with the 420 Real Estate offering. Jackson falsely held himself out as the sole person with authority over the company and the offering.

68.     Shumake and Jackson knew that disclosure of Shumake's criminal past could hinder fundraising.

69.     According to its offering statement, 420 Real Estate is a diversified investment vehicle that acquires and leases specialized real estate assets. Its strategy is to acquire industrial real estate that can be used as hemp cultivation facilities.

70.     The 420 Real Estate offering statement represented that the company was offering a maximum of 10,700 convertible notes for $100 each, and that "each subscription consists of a 15% Convertible Note that mature[d] eighteen months from the date of issuance, and at the company's option, [was] convertible at a 10% discount into the public market."

71.     The 420 Real Estate offering statement represented that, after expenses, 420 Real Estate intended to use investor proceeds as follows: (1) $537,450 for marketing; (2) $97,370 for legal fees; (3) $278,960 for property; and (4) $97,370 in administrative fees.

72.     The 420 Real Estate offering statement did not mention Bangi or any intent to use the offering proceeds for Bangi.

73.     Nearly identical to the Transatlantic Real Estate offering statement, the 420 Real Estate offering statement contained several materially false and misleading statements, including the following:

   a.   420 Real Estate's employed a senior management team that has significant experience in all aspects of the real estate industry, including acquisitions, dispositions, leasing, development, management, and finance;

   b.   420 Real Estate would use $278,960 of the proceeds for "property improvement;"

   c.   420 Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital 420 Real Estate intended to raise in the offering; and

   d.   420 Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."

74.     All of these statements were false and misleading.

75.     420 Real Estate never used any offering proceeds for "property improvement."

76.     420 Real Estate did not have a senior management team—only Jackson and Shumake. Jackson had no experience in the real estate industry.  Shumake and Jackson concealed Shumake's criminal record and the fact that Shumake would be actively involved in raising funds from investors and managing the company.

77.     Money received from investors was deposited into an account managed by TruCrowd's escrow agent. Rather than transferring the offering proceeds from the escrow agent directly to 420 Real Estate, Shumake arranged for the funds to be transferred to an account managed by an attorney he knew. The attorney was responsible for disbursing the funds and took directions individually from Shumake and Jackson.

78.     Shumake co-managed 420 Real Estate with Jackson and was extensively involved in the company's strategic decisions. For instance, Shumake:

    a.  directed communications with current and prospective investors;

    b.  helped prepare documents and promote the offering;

    c.  solicited advertisements from third parties and drafted advertising scripts for social media; and

    d.  gave directions to the attorney as to the disbursement of investor moneys.

79.     From May 2019 through June 2020, 420 Real Estate raised approximately $888,180 from the sale of convertible notes to approximately 2,000 investors in multiple states through the TruCrowd platform. The convertible notes that 420 Real Estate offered and sold to the investing public through TruCrowd were securities.

80.     Pursuant to an agreement, Jackson and Shumake had to give their joint approval for all distributions of funds from the attorney. In fact, however, Shumake and Jackson each individually directed the attorney to distribute the funds without the approval of the other.

81.     Jackson and Shumake diverted the investors' money for purposes unrelated to 420 Real Estate, including hundreds of thousands of dollars transferred to Shumake, Shumoja, Jackson, and the Jackson Entities.

82.     Shumake and Jackson diverted $280,608—or 32% of the total offering proceeds—to Jackson and the Jackson Entities.

83.     Shumake and Jackson diverted $114,029—or 13% of the total offering proceeds—to Shumake, Shumoja, and Bangi.

84.     Jackson and Shumake did not use any investor funds to buy or improve property.

85.     The 420 Real Estate investors have not received any monetary return on their investment.

## D. Petrescu and TruCrowd Allowed the Offerings to Proceed Despite Warning Signs of Fraud

86.     Petrescu owned and, as TruCrowd's owner and CEO, controlled the activities of TruCrowd.

87.     Petrescu, acting on behalf of TruCrowd, was responsible for selecting which issuers and individuals could use TruCrowd's platform to conduct crowdfunding offerings.

88.     Petrescu, acting on behalf of TruCrowd, engaged third party escrow agents to hold investor funds.

89.     In exchange for its services in connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, TruCrowd received $91,679 and $48,412, respectively.

90.     Petrescu, acting on behalf of TruCrowd, assisted issuers and their affiliated individuals with preparing and filing Forms C and offering statements.

91.     Petrescu, acting on behalf of TruCrowd, permitted the Transatlantic Real Estate and 420 Real Estate offerings to proceed despite multiple warning signs of possible fraud or other harm to investors.

92.     Petrescu, acting on behalf of TruCrowd, worked with both Shumake and Birch to file the Transatlantic Real Estate Form C and offering statement.

93.     According to Petrescu, Birch told him that she was the sole officer of Transatlantic Real Estate and that Shumake only provided marketing services.  However, Shumake routinely coordinated with Petrescu to address non-marketing matters for the company, such as investor communications and lining up a transfer agent.

94.     Petrescu did not question why the Transatlantic Real Estate offering statement omitted any mention of Shumake's involvement with the company and the offering.

95.     In November 2018, two months after the Transatlantic Real Estate offering opened, Birch forwarded an email to Petrescu from an individual who had provided marketing services to Birch and Shumake in connection with the Transatlantic Real Estate offering.

96.     This individual's email to Birch and Shumake complained that they owed him money for services he had performed on the offering, stated that he had referred Transatlantic Real Estate for collections, and warned them of the potential impact of "SEC, Bad Actor Check."

97.     These emails required action by Petrescu, and through him, by TruCrowd. Regulation Crowdfunding [17 C.F.R. §§227.301(c)] requires funding portals and their associated persons to conduct a background and securities enforcement regulatory history check (commonly referred to as a "bad actor" check) on each issuer and the issuer's officers and directors (and any persons  performing a similar function) to determine if they are subject to disqualification   from   participating   in   crowdfunding   under   Rule   503   of   Regulation

Crowdfunding, and to remove an offering from their platform if they become aware of information after they have granted access that causes them to reasonably believe that the issuer or the offering presents the potential for fraud or otherwise raises concerns about investor protection.

98.     Even after receiving this email, Petrescu never requested a bad actor check or ran a background check on Shumake. If Petrescu had done so, he would have learned of Shumake's criminal history.

99.     A short time later, in December 2018, while the Transatlantic Real Estate offering was still raising funds from investors, Petrescu referred Birch and Shumake to an experienced securities attorney, to explore the possibility of a Regulation A offering for Bangi.

100.    The securities attorney emailed Petrescu on December 14, 2018, after meeting with Shumake and Birch:

101.    The 2017 news article read, in part, as follows:

a.   "[Michigan Attorney General] Schulte says Shumake was behind a scheme to cheat people who were trying to save their homes from Foreclosure."

b.   "The attorney general's office investigated and recommended a warrant for Shumake's arrest in 2015, but Robert Shumake was in Africa."

c.   "After filing for personal bankruptcy to the tune of more than $3 million, Shumake was busy posting on Facebook about his African humanitarian work and even turned up on the Tanzanian TV news as an American investor who ran a railroad."

d.   "Last year he was caught in California with $121,000 cash in his trunk and large sums of marijuana. He's got an active arrest warrant in that case."

102.    Despite admitting that he needed "to search some more," Petrescu did not follow up on this red flag. Instead, Petrescu allowed the Transatlantic Real Estate offering to continue on TruCrowd's platform.

103.    Then, in or about April 2019, Petrescu agreed to work with Shumake again and to host the 420 Real Estate offering on TruCrowd's portal.

104.    Petrescu however, did not request a bad actor check on Shumake or otherwise investigate Shumake's past before agreeing to host the 420 Real Estate offering.

105.    The 420 Real Estate offering statement was nearly identical to the Transatlantic

Real Estate offering statement.

106.   Nevertheless, Petrescu did not question the representations in those documents that Jackson was the issuer's sole officer or the omission of any mention of Shumake's involvement with the issuer or the offering.

107.   During and after both the Transatlantic Real Estate offering and the 420 Real Estate offering, Petrescu, and through him TruCrowd, received a series of investor complaints about both the Transatlantic Real Estate and the 420 Real Estate offerings. Investors asked whether the offerings were scams. They complained to Petrescu that the issuers were not responding to inquiries. Some investors complained that they had not received certificates for their investments.  Others asked for the refund of their investments. All these emails should have raised questions for Petrescu whether the offerings presented the risk of fraud or investor harm, especially in light of the email exchanges described above.

108.   Petrescu responses to the investor emails was to assure investors that the offerings were not scams, and to represent that he had run bad actor checks.

109.   Petrescu forwarded some of the investor complaints to Shumake, Jackson, and Birch.

110.   On April 16, 2020, Jackson informed Petrescu that Shumake had acted improperly. Jackson told Petrescu that it is "very disappointing to learn that you took direction (without my knowledge) from Robert Shumake to redirect the approval of funds process for 420 Real Estate crowdfund. He is not a party to my agreement with you or [TruCrowd]." In a response on the same day copying Petrescu, Shumake stated that the 420 Real Estate offering was designed to support Bangi, Jackson's business, Ebony, and the "263k used by me to seed the operation." Yet, this email did not prompt Petrescu to question why Bangi, Ebony, and payments to Shumake were omitted from the 420 Real Estate Form C and offering statement.

111.   On April 16, 2020, when Petrescu received Jackson's email, more than $20,000 of investor funds was being held in escrow. Over the next several weeks, approximately $20,000 in additional investor money was invested and received into the escrow account.

112.   On June 8, 2020, Birch told Petrescu that Shumake had allowed a third party access to non-public information related to Transatlantic Real Estate investors, and instructed Petrescu that, going forward, he should only take direction from Birch. Petrescu responded that, until recently, he understood Shumake to be a representative of Transatlantic Real Estate and

Birch's agent.

113.    Despite these red flags, Petrescu permitted the 420 Real Estate offering to proceed on the TruCrowd platform until it stopped accepting investors in June 2020.

114.    Petrescu continued to work with Shumake after June 2020. He emailed Shumake about investor complaints. He also networked with Shumake in an effort to arrange a crowdfunding offering by at least one other issuer.

## CLASS ACTION ALLEGATIONS

115.    The Class that Plaintiff represents is composed of Jeffrey Carter and Does 1-20. Plaintiff reserves the right to amend or supplement the Class descriptions with greater specificity or further division into subclasses or limitation to certain issues based on information learned after the filing of this Complaint or after conducting discovery in this matter.

a.      **NUMEROSITY (RULE 23(a)(1)):** In the matter at hand, the precise enumeration of the Members encompassed within the Classes remains shrouded in ambiguity and is not explicitly ascertainable to the Plaintiffs. This however, does not obfuscate the inherent impracticability of having each individual plaintiff join the proceedings separately. The nature and scope of the defendant's alleged wrongful conduct are of such magnitude and widespread effect that the mere thought of each aggrieved party independently participating in the litigation is both cumbersome and unrealistic.

Delving into the specifics, the defendant's purported fraudulent activities revolve around unregistered crowdfunding venture executed through Transatlantic Real Estate, purportedly associated with the cannabis industry. Records indicate a staggering accumulation of $1,020,100 from unsuspecting retail investors via this Real Estate facade. Instead of deploying these funds for the expressly stated objectives, as articulated to the investors, the defendant is believed to have orchestrated a deceitful scheme, channeling significant portions of the investment for personal enrichment. Moreover, the defendant's glaring lapses in due diligence become increasingly evident upon closer scrutiny.

Notably, the defendant purportedly overlooked and neglected pivotal red flags, notably the dubious criminal background of Shumake, who was intricately intertwined with the crowdfunding endeavors. This oversight, combined with a glaring failure to institute adequate safeguards, has further exacerbated the risk and magnitude of the

alleged fraudulent activities, detrimentally impacting the unsuspecting investors. Given the intricate web of deceit, the substantial amount involved, and the vast number of potential aggrieved parties, it is abundantly clear that attempting to consolidate this litigation without the collective strength of a unified class would be both inefficient and inequitable. Thus, while the exact numerical extent of the Classes remains indeterminate, the overarching impracticability of individual joiner remains indisputably evident.

b.   **COMMONALITY (RULE 23(a)(2) and 23(b)(3)):** In the realm of collective litigation, the cornerstone of a class action lies in the shared questions of law and fact that resonate amongst its members. This unity not only ensures the efficiency of the judicial process but also safeguards against inconsistent adjudications that might arise from fragmented litigation. Herein, it is palpably evident that the Class members, stemming from the defendant's alleged misconduct, are bound together by a tapestry of common concerns.

**Firstly,** a central issue that uniformly affects all members revolves around the defendant's purportedly fraudulent and unregistered crowdfunding initiative facilitated through Transatlantic Real Estate, ostensibly linked to the cannabis domain. This singular modus operando led to the accumulation of a substantial sum, amounting to $1,020,100, extracted from a multitude of retail investors under the auspices of Real Estate endeavors.

**Secondly,** the misdirection and misappropriation of investor funds stand out as a pivotal commonality. Rather than prudently allocating these resources in alignment with the representations made to the investors, the defendant's alleged actions suggest a blatant deviation. Such a breach of trust and fiduciary responsibility resonates uniformly amongst all Class members, signifying a shared injury.

**Furthermore,** the defendant's alleged negligence and oversight regarding critical red flags, especially concerning Shumake's criminal antecedents and his intricate involvement in the crowdfunding framework, present another layer of commonality.

This oversight, or potentially willful neglect, amplified the inherent risks associated with the investment, exposing every Class member to undue harm.

In essence, while the nuances of individual experiences might vary, the overarching narrative remains consistent:

a breach of trust, alleged fraudulent activities, and a shared detriment borne out of the defendant's actions.

These shared concerns underscore the imperative for a collective and unified legal strategy, ensuring that justice is not only served but is also perceived as equitable and uniform for all Class members.

c.      **TYPICALITY (Rule 23(a)(3)):** Central to the integrity of a class action lawsuit is the concept of typicality, ensuring that the claims of the representative plaintiff resonate with the broader concerns of the entire class.

This ensures that the representative's interests are in harmony with those of the class members, thereby reinforcing the collective pursuit of justice.

In the present scenario, a meticulous examination of the allegations against the defendant vis-à-vis the claims of the representative plaintiff elucidates a clear pattern of typicality.

The representative plaintiff's grievance, rooted in the defendant's purportedly fraudulent and unregistered crowdfunding operation via Transatlantic Real Estate, mirrors the overarching narrative that binds the entire class.

Specifically, the defendant's alleged orchestration of a deceptive scheme that siphoned a considerable sum, precisely $1,020,100, from unsuspecting retail investors under the guise of Real Estate ventures, is emblematic of the harms suffered by every class member.

Furthermore, the crux of the representative plaintiff's claim, which revolves around the defendant's egregious misallocation of investor funds for personal gains, is a reflection of the broader malfeasance alleged against the defendant.

This misdirection of funds, in stark contradiction to the promises and disclosures made to the investors, underscores a shared injury that is palpable across the class spectrum.

Additionally, the defendant's purported negligence, or potential deliberate oversight, in addressing critical red flags—most notably, Shumake's questionable criminal past and his intricate involvement in the crowdfunding endeavors—serves as another testament to the typicality of the representative plaintiff's claim.

This shared experience of being misled and exposed to undue risks due to the defendant's alleged omissions further solidifies the representative plaintiff's position as a genuine and resonant voice for the entire class.

In summation, the representative plaintiff's allegations, grounded in the defendant's alleged fraudulent actions, misappropriation of funds, and neglect of pivotal red flags, are emblematic of the broader class's experiences and grievances.

Such congruence in claims not only underscores the representative's role as an apt spokesperson for the class but also fortifies the foundational principle of typicality essential for the pursuit of collective justice.

d.   **ADEQUACY OF REPRESENTATION (Rule 23(a)(4)):** The hallmark of a robust class action lawsuit lies not just in the coherence of its claims but also in the competence and commitment of its representation.

Rule 23(a)(4) underscores the necessity for a plaintiff, and by extension, their legal counsel, to be both willing and capable of championing the interests of the entire class.

In the instant case, a detailed examination of the representative plaintiff's commitment and the proficiency of their legal representation vis-à-vis the defendant's alleged malfeasance paints a compelling picture of adequacy.

Firstly, the representative plaintiff's unwavering pursuit of justice against the defendant, stemming from the purported fraudulent activities involving Transatlantic Real Estate, epitomizes a dedication to ensuring that the interests of all class members are vigorously safeguarded. The egregious act of diverting a substantial amount, precisely $1,020,100, from retail investors, coupled with the deceptive promise of Real Estate ventures, demands a representation that is both resolute and astute.

The representative plaintiff's steadfastness in bringing forth these claims underscores their commitment to the broader class's welfare.

Equally pivotal to the adequacy of representation is the competence and expertise of the retained legal counsel.

In this regard, the representative plaintiff has exhibited prudence by enlisting lawyers with a proven track record in navigating the intricacies of complex litigation and class action suits.

Such legal prowess not only ensures that the class's interests are articulated with precision but also reinforces the collective pursuit of justice with the requisite acumen.

Furthermore, the multifaceted nature of the defendant's alleged wrongdoing, ranging from misappropriation of funds to a glaring oversight of critical red flags like Shumake's criminal entanglements, necessitates a legal team adept at dissecting intricate details and presenting a cogent argument.

The representative plaintiff's choice of experienced trial lawyers exemplifies a strategic approach aimed at ensuring that every nuance of the defendant's alleged malfeasance is meticulously addressed, thereby amplifying the prospects of a favorable outcome for the class.

In essence, when juxtaposed against the backdrop of the defendant's purported wrongful conduct, the representative plaintiff's unwavering commitment to justice, coupled with the expertise of their retained legal counsel, unequivocally establishes the adequacy of representation mandated by Rule 23(a)(4).

Such a confluence of dedication and proficiency bodes well for the class, instilling confidence that their rights and interests are in capable and committed hands.

116.   There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members. Furthermore, the representative Plaintiff has consistently communicated and collaborated with various Class members to ensure alignment in objectives and strategies. The legal team's proactive approach in establishing open channels of communication with the Class, coupled with regular updates and feedback sessions, underscores their commitment to inclusivity and transparency. Additionally, the legal team's prior experience in managing similar class actions, coupled with a demonstrated track record of securing favorable outcomes for class members, further solidifies the confidence reposed in them. Their dedication to seeking maximum restitution and justice for every affected individual within the Class epitomizes the very essence of zealous representation, thereby reinforcing the appropriateness of class certification.

117.   This action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure for the following reasons:

a.     **<u>Class Action Status (Rule 23(b)(1))</u>:** Initiating separate actions by

potential Class members threatens to introduce conflicting standards of conduct for the defendant. Given the defendant's multifaceted fraudulent activities, disparate judgments could foster inconsistencies, undermining the pursuit of justice and clarity.

Individual prosecutions by potential Class members pose an acute risk of judgments that might disproportionately influence the broader Class. Such isolated adjudications could jeopardize the rights and interests of other members, potentially hindering their capacity to seek redress or safeguard their claims. Given the interconnected nature of the defendant's transgressions, a unified class action approach is imperative to ensure cohesive remedies and protect the collective interests of the aggrieved investors.

In light of the defendant's deliberate misconduct and the consequential harm inflicted upon the investors, class action status is unequivocally warranted. Adopting a consolidated approach through Rule 23(b)(1) not only streamlines the litigation process but also fosters fairness, ensuring that all affected parties have an equitable opportunity for recourse.

b. **Declaratory and Injunctive Relief (Rule 23(b)(2)):** Certification under Rule 23(b)(2) is unequivocally justified in this instance. The defendant's actions, or lack thereof, have had broad and overarching implications, affecting the entirety of the putative Class. As such, it is imperative to secure final injunctive, declaratory, or other appropriate equitable remedies to redress the collective grievances and to prevent future harm.

Given the defendant's systematic misconduct and its ramifications on the broader investor community, declaratory and injunctive relief under Rule 23(b)(2) is not only appropriate but essential. Such relief serves to restore confidence, rectify injustices, and ensure that the defendant's injurious practices are decisively curtailed, safeguarding both present and future investors.

c. **Superiority (Rule 23(b)(3)):** The certification of this action as a class under Rule 23(b)(3) is not only appropriate but also advantageous. Common questions of law and fact permeate the claims of the putative Class members, including the defendant's deceptive practices, the misallocation of investor funds, and the overall harm inflicted. Addressing these shared issues collectively promotes consistency in legal determinations

and prevents duplicative litigation.

Furthermore, class action treatment stands out as the superior mechanism for the resolution of this controversy. Consolidating the claims of the Class ensures efficiency, avoids the potential for conflicting judgments, and provides a streamlined avenue for the fair distribution of any recoverable assets or remedies. Given the magnitude and interconnected nature of the defendant's transgressions, class action treatment maximizes judicial economy while preserving the rights and interests of the aggrieved investors.

In light of the defendant's widespread misconduct and the shared challenges faced by the putative Class members, certification under Rule 23(b)(3) is both warranted and beneficial. Such a consolidated approach ensures equitable treatment, promotes efficiency, and underscores the fundamental principles of justice and fairness.

The Class is ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class member were infringed or violated in the same or similar fashion.

## **FIRST CAUSE OF ACTION**

### **Violations of Section 17(a) of the Securities Act**

### **[15 U.S.C. § 77q(a)]**

### **(Shumake, Jackson, Birch and 420 Real Estate)**

118.    Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

119.    By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] to wit:

> *__15 U.S. Code § 77q - Fraudulent interstate transactions__*
> *__(a)Use of interstate commerce for purpose of fraud or__*
> *__deceit: It shall be unlawful for any person in the offer or sale of__*
> *__any securities (including security-based swaps) or any security-__*
> *__based swap agreement (as defined in section 78c(a)(78) [1] of this__*
> *__title) by the use of any means or instruments of transportation or__*
> *__communication in interstate commerce or by use of the mails,__*
> *__directly or indirectly—__*
> > *(1) to employ any device, scheme, or artifice to defraud, or*

*(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or*

*(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. (__Emphasis Supplied__)*

120.     By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

121.     Defendants Shumake, Jackson, Birch, and 420 Real Estate acted knowingly, recklessly, and/or negligently, in engaging in the conduct described above.

## SECOND CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]
### (Shumake, Jackson, Birch and 420 Real Estate)

122.     Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

123.     Through the foregoing, Defendants Shumake, Jackson, Birch, and 420 Real Estate violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] to wit:

*__15 U.S. Code § 78j - Manipulative and deceptive devices__*
*__(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or__*

*contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.* **(Emphasis Supplied)**

*xxx*

   *§ 240.10b-5 Employment of manipulative and deceptive devices: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,*

   *(a) To employ any device, scheme, or artifice to defraud,*

   *(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or*

   *(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,*

   *in connection with the purchase or sale of any security.* **(Emphasis Supplied)**

124.    By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

125.    Defendants Shumake, Jackson, Birch, and 420 Real Estate acted knowingly and/or recklessly, in engaging in the fraudulent conduct described above.

### THIRD CAUSE OF ACTION

**Violations of Section 5(a) and (c) of the Securities Act**

**[15 U.S.C. § 77e(a) and (c)]**

**(Shumake and Birch as to Transatlantic Real Estate)**

126.    Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs

as if fully set forth herein.

127.   By engaging in the conduct described above, Defendants Shumake and Birch violated, and unless restrained and enjoined are reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] To wit:

**15 U.S. Code § 77e - Prohibitions relating to interstate commerce and the mails:**

*(a)Sale or delivery after sale of unregistered securities Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—*

*(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or*

*(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.*

*(b)Necessity of prospectus meeting requirements of title It shall be unlawful for any person, directly or indirectly—*

*(1)*

*to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or*

*(2)*

*to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.*

*(c)Necessity of filing registration statement*

*It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.*

128.   From in or about September 2018 through in or about June 2019, Defendants Shumake and Birch directly or indirectly, as to securities of Transatlantic Real Estate: (a) made use of the means or instruments of transportation or communication in interstate commerce or

of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the SEC or being in effect as to such securities.

129.    No registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of Transatlantic Real Estate by Defendants Shumake and Birch, and no exemption from the registration requirements applied to Defendant Shu make's and Birch's sales.

### FOURTH CAUSE OF ACTION

**Violations of Section 5(a) and (c) of the Securities Act**

**[15 U.S.C. § 77e(a) and (c)]**

**(Shumake, Jackson and 420 Real Estate)**

130.    Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

131.    By engaging in the conduct described above, Defendants Shumake, Jackson, and 420 Real Estate violated, and unless restrained and enjoined are reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**15 U.S. Code § 77e - Prohibitions relating to interstate commerce and the mails:**
*(a)Sale or delivery after sale of unregistered securities Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—*
*(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or*
*(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.*
*(b)Necessity of prospectus meeting requirements of section 77j of this titleIt shall be unlawful for any person, directly or indirectly—*
*(1)*
*to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit*

*any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or*

*(2)*

*to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.*

**(c)Necessity of filing registration statement**

**It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.**

132.    From in or about July 2019 through in or about June 2020, Defendants Shumake, Jackson and 420 Real Estate, directly or indirectly, as to securities of Defendant 420 Real Estate: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell  securities through the use or medium of a prospectus or otherwise; or carried  securities or caused such securities to be carried through the mails or in interstate  commerce, by means or instruments of transportation, for the purpose of sale or  delivery after sale; and (b) made use of the means or instruments of transportation  or communication in interstate commerce or of the mails to offer to sell or to offer  to buy, through the use or medium of any prospectus or otherwise, securities  without a registration statement having been filed with the SEC or being in effect  as to such securities.

133.    No registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of Defendant 420 Real Estate by Defendants Shumake, Jackson or 420 Real Estate, and no exemption from the registration requirements applied to the sales by Defendant Shumake, Jackson, and 420 Real Estate.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Violations of

### Section 17(a) of the Securities Act

**[15 U.S.C. § 77q(a)]**

**(Shumake)**

134.     Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

135.     As described above, Defendants Jackson and Birch, in the offer and sale of securities, respectfully, of 420 Real Estate and Transatlantic Real Estate, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

136.     By engaging in the conduct described, Defendants Jackson and Birch violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]. 124. Defendant Shumake knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

137.     By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 17(a) of the Securities Act, by Defendants Jackson and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Shumake is liable to the same extent as Defendants Jackson and Birch for their violations of Section 17(a) of the Securities Act.

> ***15 U.S. Code § 77q - Fraudulent interstate transactions***
> ***(a)Use of interstate commerce for purpose of fraud or deceit: It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) [1] of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—***
>
> *(1)to employ any device, scheme, or artifice to defraud, or*
>
> *(2)to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or*
>
> *(3)to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. (**Emphasis Supplied**)*

## <u>SIXTH CAUSE OF ACTION</u>

**Aiding and Abetting Violations of**

**Section 10(b) of the Exchange Act**

**and Exchange Act Rule 10b-5**

**[15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]**

**<u>(Shumake)</u>**

138.     Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

139.     By engaging in the conduct described, Defendants Jackson and Birch violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

> *15 U.S. Code § 78j - Manipulative and deceptive devices*
> *(b)*
> *To use or employ, in connection with the <u>purchase</u> or <u>sale</u> of any <u>security</u> registered on a national securities <u>exchange</u> or any <u>security</u> not so registered, or any securities-based <u>swap</u> agreement <u>[1]</u> any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the <u>Commission</u> may prescribe as necessary or appropriate in the public interest or for the protection of investors.* **(Emphasis Supplied)**

> *17 CFR § 240.10b-5 - Employment of manipulative and deceptive devices: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any <u>national securities exchange</u>,*
> *(a) To employ any device, scheme, or artifice to defraud,*
> *(b) To make any untrue statement of a <u>material</u> fact or to omit to state a <u>material</u> fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or*
> *(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,*
> *in connection with the purchase or sale of any <u>security</u>.*

140.     As described above, Defendants Jackson and Birch in connection with the purchase and sale of securities, respectfully, of 420 Real Estate and Transatlantic Real Estate, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud; made untrue

statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

141.   Defendant Shumake knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

142.   By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Defendants Jackson and Birch and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Shumake is liable to the same extent as Defendants Jackson and Birch for their violations of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Violations of
### Sections 5(a) and (c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and (c)]
### (Shumake)

143.   Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

144.   By engaging in the conduct described, Defendants Jackson and Birch violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

> *15 U.S. Code § 77e - Prohibitions relating to interstate commerce and the mails:*
> *(a)Sale or delivery after sale of unregistered securities Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—*
>
> *-xxx-*
>
> *(c)Necessity of filing registration statement*
> *It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise*

*any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.* **(Emphasis Supplied)**

145.    As described, Defendants Jackson and Birch offered and sold securities of, respectfully, 420 Real Estate and Transatlantic Real Estate, when no registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of either issuer, and no exemption from the registration requirements applied to Defendants' sales.

146.    Defendant Shumake knowingly and/or recklessly provided substantial assistance to the unregistered offers and sales by Defendants Jackson and Birch.  135. By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 5(a) and 5(c) of the Securities Act, by Defendants Jackson and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Shumake is liable to the same extent as Defendants Jackson and Birch for their violations of Sections 5(a) and (c) of the Securities Act.

## EIGHTH CAUSE OF ACTION

### Violations of Section 4A(a)(5) of the Securities Act and

### Rules 301(c)(2) Thereunder

### [15 U.S.C. § 77d–1(a)(5) and 17 C.F.R. 17 C.F.R. § 227.301(c)(2)]

### (Petrescu and TruCrowd)

147.    Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

148.    In connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, Defendant TruCrowd was an intermediary, and Petrescu was an associated person of an intermediary, for purposes of Section 4A of the Securities Act [15 U.S.C. § 77d–1] and Rules 300(c)(1) and 300(c)(3) thereunder [17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)].

*17 CFR § 227.300 - Intermediaries.*

*(c) Definitions. For purposes of this part:*

*(1) Associated person of a funding portal or person associated with a funding portal means any partner, officer, director or manager of a funding portal (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling or controlled by such funding portal, or any **employee** of a funding portal, except that any person associated with a funding portal whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of section 15(b) of the **Exchange Act (15 U.S.C. 78o**(b)) (other than paragraphs (4) and (6) of section 15(b) of the Exchange Act).*

*-xxx-*

*(3) Intermediary means a broker registered under section 15(b) of the **Exchange Act** (15 U.S.C. 78o(b)) or a funding portal registered under § 227.400 and includes, where relevant, an associated person of the registered broker or registered funding portal.*

149.    As described above, Defendants Petrescu and TruCrowd allowed Defendants access to TruCrowd's crowdfunding platform in connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings.

150.    As described in Paragraphs 75 through 104, above, Defendants Petrescu and TruCrowd (1) had a reasonable basis for believing that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection; (2) reasonably believed, or should have reasonably believed, that they were unable to adequately or effectively assess the risk of fraud associated with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings; and (3) became aware of information, after they had granted access to the TruCrowd crowdfunding platform for the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, that caused them to reasonably believe, or in the exercise of reasonable care should have caused them to reasonably believe, that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection.

151.    As described above, Defendants Petrescu and TruCrowd failed to deny access to TruCrowd's crowdfunding platform and failed to promptly remove the Transatlantic Real Estate and 420 Real Estate offerings from TruCrowd's crowdfunding platform, cancel the offerings, and return and direct the return of any funds that had been committed by investors in

the offerings.

152.    By reason of the foregoing, Defendants TruCrowd and Petrescu have violated, and unless restrained and enjoined are reasonably likely to continue to violate, Section 4A(a)(5) of the Securities Act [15 U.S.C. § 77d–1(a)(5)] and Rule 301(c)(2) thereunder [17 C.F.R. § 227.301(c)(2)].

## NINTH CAUSE OF ACTION
### (Breach of Contract)

153.    Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

154.     In the esteemed jurisdiction of California, the integrity and sanctity of contractual obligations are held in paramount regard. The foundation of our legal system is predicated upon the principle that agreements, once entered into, should be upheld with the utmost fidelity. Given the circumstances surrounding the defendant's actions, a comprehensive examination and subsequent allegation for breach of contract is both warranted and compelling.

155.    It is evident that an implicit contract was established between the defendant and the retail investors. By virtue of the defendant's actions in conducting a crowdfunding offering through Transatlantic Real Estate, a nexus of trust and reliance was formed. This trust, although potentially implied, underscored an understanding that the raised funds would be utilized for the disclosed purposes and in alignment with the representations made to the investors.

156.    The crux of the breach lies in the defendant's egregious diversion of investor funds for personal enrichment. Instead of honoring the implicit or explicit terms of the agreement – which presumably obligated the defendant to utilize the raised $1,020,100 for the stated purposes – the defendant chose a path marred by deception and self-interest. Such a blatant deviation from the agreed-upon terms unequivocally signifies a breach of the contractual obligations owed to the investors.

157.    The repercussions of the defendant's breach are multifaceted. Beyond the direct financial ramifications of the misappropriated funds, the investors have suffered reputational harm, emotional distress, and potential legal consequences due to their unwitting association

with the defendant's fraudulent scheme. The gravity of these damages cannot be understated, and they stand as a testament to the profound impact of the defendant's contractual transgressions.

158.     Further exacerbating the breach are the defendant's glaring omissions and oversights. The failure to address critical red flags, notably Shumake's criminal history and questionable involvement in the crowdfunding offerings, reveals a wanton disregard for the safety, rights, and interests of the investors. Such negligence not only amplifies the breach but also underscores a pattern of deceit and negligence, warranting heightened scrutiny and accountability.

159.     In conclusion, under the esteemed tenets of California law, the defendant's actions, characterized by deception, misappropriation, and negligence, unequivocally culminate in a compelling cause of action for breach of contract. The investors, having placed their trust and resources in the defendant's hands, deserve not only restitution but also the affirmation that such egregious breaches of trust will be met with the full force of the law.

## **TENTH CAUSE OF ACTION**
### **(Fraudulent Misrepresentation)**

160.     Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

161.     In the esteemed jurisdiction of California, the pillars of justice and honesty are integral to our legal framework. The principle that individuals and entities should not be deceived or misled in matters of significant consequence is a cornerstone of our legal edifice. Given the events surrounding the defendant's actions, an in-depth analysis and subsequent assertion for fraudulent misrepresentation under California law are not only warranted but are also imperative to uphold the integrity of our legal system.

162.     The defendant, in orchestrating a crowdfunding offering through Transatlantic Real Estate, implicitly or explicitly conveyed representations to the retail investors regarding the utilization of the raised funds. These representations, given their significance, can be deemed material to the investment decision-making process of the investors.

163.     It is evident that the defendant, at the time of making these representations, was

aware of their falsity. The diversion of investor funds for personal gain, instead of the purported purposes, starkly contradicts the assurances and promises made to the investors. This deliberate act of deception underscores the defendant's conscious awareness of the misinformation being disseminated.

164.    The very act of conducting an unregistered and fraudulent crowdfunding offering, coupled with the conscious decision to divert funds, reflects an intent on the defendant's part to deceive the investors. By doing so, the defendant aimed to induce the investors into parting with their funds under false pretenses, thereby gaining an undue advantage.

165.    The investors, relying on the defendant's misrepresentations, entrusted their resources, amounting to $1,020,100, with the belief that their investments would be utilized as disclosed. This reliance, stemming from the defendant's deceptive practices, led to tangible and intangible harm, including financial losses, reputational damage, and emotional distress.

166.    The defendant's failure to address glaring red flags, especially concerning Shumake's criminal history and dubious involvement, further underscores the fraudulent nature of the misrepresentations. Such omissions not only facilitated the deception but also exacerbated the risks and vulnerabilities faced by the unsuspecting investors.

167.    In summation, under the venerable principles of California law, the defendant's actions, marked by deceit, intentional misrepresentations, and a conscious effort to defraud investors, unequivocally culminate in a robust cause of action for fraudulent misrepresentation. The investors, having been ensnared in a web of deceit, deserve not only recompense but also the assurance that such malicious and fraudulent conduct will be met with the full brunt of legal scrutiny and accountability.

## ELEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

168.    Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

169.     In the esteemed jurisdiction of California, the fiduciary relationship stands as a testament to the highest standard of trust, confidence, and loyalty between parties. Such relationships are founded on an implicit understanding that one party (the fiduciary) will act in

the best interests of another party (the beneficiary), prioritizing their interests above all else. When this sacrosanct duty is breached, the ramifications are profound, warranting rigorous legal scrutiny and intervention. Given the defendant's actions, an assertion for breach of fiduciary duty under California law is not only justifiable but imperative to safeguard the principles of trust and integrity.

170.    The defendant, in conducting the crowdfunding offering through Transatlantic Real Estate and subsequently raising $1,020,100 from retail investors, assumed a fiduciary role vis-à-vis the investors. This role inherently imposed upon the defendant an obligation to act with the utmost good faith, loyalty, and candor, placing the investors' interest's paramount.

171.    The gravamen of the breach lies in the defendant's diversion of investor funds for personal enrichment, in contravention of the purposes disclosed and the investors' expectations. Such a deviation from the fiduciary's duty to act in the beneficiaries' best interests is not only a betrayal of trust but also a blatant disregard for the fiduciary obligations owed.

172.    The defendant's failure to address and act upon evident red flags, especially pertaining to Shumake's criminal history and questionable involvement, underscores a conscious disregard for the investors' well-being. A fiduciary, when confronted with such critical information, is duty-bound to act prudently, transparently, and in a manner that mitigates risks to the beneficiaries. The defendant's omissions and inactions signify a grave dereliction of this duty.

173.    The investors, entrusting their resources based on the defendant's fiduciary obligations, have suffered significant harm, both pecuniary and non-pecuniary. The misappropriation of funds, coupled with the heightened risks due to the defendant's negligence, has resulted in tangible financial losses, reputational damage, and emotional distress for the investors.

174.    The defendant's overarching pattern of deception, marked by the fraudulent crowdfunding offering and the conscious decision to prioritize personal gains over fiduciary duties, accentuates the severity of the breach. Such calculated actions not only undermine the foundational principles of fiduciary relationships but also warrant enhanced judicial scrutiny and accountability.

175.    In conclusion, under the venerable tenets of California law, the defendant's actions, characterized by a profound breach of fiduciary duties, deception, and neglect, unequivocally

establish a robust cause of action for breach of fiduciary duty. The investors, having reposed trust and confidence in the defendant's fiduciary obligations, deserve not only restitution but also the reaffirmation that such egregious breaches will be met with resolute legal consequences and accountability.

## TWELVETH CAUSE OF ACTION
### (Unlawful Business Practice:)

176.    Plaintiffs re-allege and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

177.    In the robust legal landscape of California, the integrity and fairness of business practices are held in the highest esteem. The state's stringent regulations and jurisprudence are designed to protect consumers and investors alike from deceptive, unfair, and fraudulent business activities. Given the egregious actions of the defendant, a cause of action for unlawful business practice under California's Unfair Competition Law (UCL) is both warranted and pivotal to uphold the state's commitment to ethical commerce and investor protection.

178.    The defendant's orchestration of a fraudulent and unregistered crowdfunding offering through Transatlantic Real Estate lays the foundation for unlawful business practices. Such actions contravene established norms, regulations, and statutes governing securities offerings, thereby constituting a foundational violation of the UCL.

179.    The defendant's misrepresentation and diversion of investor funds for personal use, juxtaposed against the purported purposes disclosed to investors, epitomize deceptive business practices. By intentionally misleading investors and breaching the implicit trust reposed in them, the defendant engaged in acts that are inherently unfair within the purview of the UCL.

180.    Beyond overt acts of deception, the defendant's failure to address conspicuous red flags, notably Shumake's criminal history and dubious involvement, signifies a neglectful business approach that exposes investors to undue risks. Such omissions, when viewed in the broader context of the crowdfunding offering, underscore a pattern of negligent business practices that jeopardize consumer interests and violate the principles enshrined in the UCL.

181.    The investors, as a direct consequence of the defendant's unlawful business practices, have suffered substantial harm. The misallocation of funds, combined with the

heightened risks emanating from the defendant's negligence, has precipitated financial losses, reputational harm, and emotional anguish for the aggrieved parties.

182.    The defendant's calculated and deliberate actions, designed to prioritize personal gains at the expense of investors' interests, accentuate the gravity of the unlawful business practices. Such a blatant disregard for ethical norms and regulatory compliance not only undermines the integrity of the financial markets but also warrants enhanced judicial intervention and accountability.

183.    In summation, under the distinguished tenets of California's legal framework, the defendant's actions, characterized by deceptive practices, neglect, and a brazen disregard for investor protection, unequivocally establish a compelling cause of action for unlawful business practices under the UCL. The investors, having been ensnared in a web of deceit and misconduct, merit not only restitution but also the assurance that California's commitment to ethical business conduct and consumer protection remains unwavering and resolute.

## THIRTEENTH CAUSE OF ACTION
### (Negligence)

184.    Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

185.    In the intricate tapestry of California's legal framework, the principle of negligence serves as a beacon, illuminating the duties and responsibilities that individuals and entities owe to others. Grounded in the bedrock of reasonableness and prudence, negligence claims arise when one's actions, or lack thereof, fall below the established standard of care, resulting in harm or damage to another party. Given the detailed facts pertaining to the defendant's actions, a cause of action for negligence under California law is both evident and compelling.

186.    The defendant, by virtue of initiating and overseeing the crowdfunding offering through Transatlantic Real Estate, assumed a duty of care to the retail investors. This duty encompassed an obligation to act with reasonable care, diligence, and foresight, ensuring that the investors' interests and investments were safeguarded against foreseeable harm.

187.    The defendant's diversion of investor funds for personal use, in contravention of

the disclosed purposes, represents a clear breach of the duty of care owed to the investors. Such misallocation and misappropriation of funds not only deviated from the established standards of prudent financial management but also exposed the investors to undue risks and vulnerabilities.

188.    The defendant's failure to address glaring red flags, including Shumake's criminal history and questionable involvement, underscores a lack of due diligence and oversight equating to a breach of the duty of the Defendants. This omission, when viewed in conjunction with the fraudulent nature of the crowdfunding offering, establishes a nexus between the defendant's actions (or omissions) and the resultant harm suffered by the investors. The harm, therefore, was foreseeable and directly attributable to the defendant's negligent conduct.

189.    As a direct consequence of the defendant's negligence, the investors have incurred significant financial losses, reputational damage, and emotional distress. These damages, stemming from the defendant's failure to uphold the requisite standard of care, underscore the tangible and intangible repercussions of the defendant's actions.

190.    The defendant's deliberate disregard for regulatory compliance, coupled with a conscious choice to prioritize personal gains over the investors' interests, amplifies the gravity of the negligence. Such calculated actions not only undermine the foundational principles of trust and transparency but also warrant heightened judicial scrutiny and accountability.

191.    In conclusion, under the esteemed tenets of California law, the defendant's actions, characterized by a profound breach of the duty of care, foreseeable harm, and resultant damages, unequivocally establish a robust cause of action for negligence. The investors, having entrusted their resources based on the defendant's duty-bound assurances, merit not only restitution but also the reaffirmation that such breaches of trust will be met with resolute legal consequences and accountability.

## FOURTEENTH CAUSE OF ACTION
### (Conversion)

193.    Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

194.    In the jurisprudential realm of California, the tort of conversion serves as a potent legal remedy, designed to address the wrongful deprivation of another's property rights. Rooted in principles of equity and fairness, this cause of action seeks to redress situations where one

party wrongfully exercises control over another's property, thereby depriving them of their rightful possession or use. Given the intricate details associated with the defendant's conduct, there emerges a compelling cause of action alleging conversion under California law.

195.     The defendant's initiation of a crowdfunding offering through Transatlantic Real Estate resulted in the aggregation of funds amounting to $1,020,100 from retail investors. These funds, entrusted to the defendant, remained the rightful property of the investors, subject to the specific investment purposes disclosed.

196.     The defendant's diversion of these investor funds for personal use, in contravention of the disclosed purposes and without the explicit consent of the investors, represents a wrongful exercise of control. By appropriating these funds for personal enrichment, the defendant deprived the investors of their rightful possession and use of their property.

197.     The essence of conversion lies in the wrongful deprivation of another's property rights. In this instance, the defendant's actions resulted in a tangible and unjust deprivation for the investors, who, in the absence of the defendant's wrongful conduct, would have retained full control and use of their funds in line with the disclosed investment objectives.

198.     As a direct consequence of the defendant's conversion, the investors have suffered quantifiable damages, including the loss of their investment and any potential returns or benefits that would have accrued from a legitimate use of the funds. The defendant's wrongful actions, which disrupted the investors' property rights, resulted in tangible financial harm, underscoring the gravity of the conversion.

199.     The defendant's calculated scheme, marked by deliberate misappropriation of investor funds, intentional non-disclosures, and a flagrant disregard for property rights, accentuates the severity of the alleged conversion. Such egregious conduct not only underscores the wrongful nature of the defendant's actions but also warrants heightened judicial intervention and redress.

200.     In conclusion, under California's venerable legal traditions, the defendant's actions, characterized by the wrongful exercise of control over investor funds, deprivation of property rights, and tangible financial harm, unequivocally establish a robust cause of action for conversion. The aggrieved investors, having been unjustly deprived of their rightful property, merit not only restitution but also the assurance that California's commitment to upholding property rights and ensuring justice remains unwavering and resolute.

**FIFTEENTH CAUSE OF ACTION**

**(Civil Conspiracy to Commit Fraud)**

201.     Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

202.     In the esteemed legal corridors of California, the tort of civil conspiracy stands as a testament to the recognition that wrongful collaborations can often amplify harm, warranting collective liability. The essence of civil conspiracy lies in the collaborative agreement between two or more parties to commit an unlawful act or to achieve a lawful end through unlawful means, resulting in damages to another party. Given the intricacies surrounding the defendant's conduct, there emerges a compelling cause of action alleging civil conspiracy under California law.

203.     The crux of civil conspiracy hinges upon the existence of an agreement between two or more parties to undertake an unlawful act. In this scenario, the defendant's orchestration of a fraudulent and unregistered crowdfunding offering through Transatlantic Real Estate suggests a premeditated plan. Such conduct, when viewed in conjunction with the subsequent diversion of investor funds for personal gain, hints at a concerted effort, whether explicit or implicit, to commit wrongful acts.

204.     The defendant's actions, encompassing the fraudulent offering and the subsequent misappropriation of investor funds, signify an unlawful objective. The collaboration, manifesting in the pooling of funds and their subsequent diversion, showcases a shared intent to deceive investors and unjustly enrich the defendant, constituting the unlawful end sought through the alleged conspiracy.

205.     Civil conspiracy not only demands an agreement but also necessitates overt acts in furtherance of the conspiracy. The defendant's actions, from the initiation of the crowdfunding offering to the subsequent misuse of funds, represent tangible manifestations of the alleged conspiracy. Furthermore, the defendant's failure to address red flags and mitigate risks, especially concerning Shumake's involvement, underscores a collective neglect and shared responsibility in perpetuating the alleged wrongdoing.

206.     As a direct consequence of the alleged conspiracy, the investors have suffered significant damages, both financially and reputational. The collaborative efforts of the defendant,

marked by deceit, diversion, and neglect, have precipitated tangible harm, emphasizing the collective responsibility inherent in civil conspiracy.

207.    The defendant's calculated and collaborative scheme, characterized by intentional non-compliance, misappropriation of funds, and a collective neglect of investor interests, accentuates the gravity of the alleged civil conspiracy. Such concerted efforts not only magnify the harm inflicted but also underscore the need for stringent legal redressed and accountability.

208.    In conclusion, under California's esteemed legal traditions, the defendant's alleged collaboration, marked by shared intent, overt acts, and resulting harm, unequivocally establishes a robust cause of action for civil conspiracy. The aggrieved investors, having been ensnared in a web of collaborative deceit and misconduct, merit not only restitution but also the assurance that California's commitment to upholding justice and accountability remains unwavering and resolute.

## SIXTEENTH CAUSE OF ACTION
### (Constructive Trust or Equitable Lien)

209.    Plaintiffs re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

210.    Within the sophisticated and equitable framework of California jurisprudence, the doctrines of constructive trust and equitable lien serve as indispensable tools, ensuring that wrongdoers do not unjustly benefit from their malfeasance at the expense of others. These equitable remedies aim to prevent unjust enrichment and to secure restitution for those who have been wronged. Given the intricate facts surrounding the defendant's actions, there emerges a compelling cause of action alleging the imposition of a constructive trust or equitable lien under California law.

211.    At the heart of the matter lies the defendant's diversion of investor funds for personal gain, contrary to the disclosed purposes and the expectations of the investors. Such actions have resulted in the defendant's unjust enrichment, as they have retained and utilized funds that rightfully belong to the investors, without valid justification.

212.    The defendant's role in conducting the crowdfunding offering imbued them with fiduciary responsibilities towards the investors. By misappropriating funds and failing to act in the investors' best interests, the defendant breached their fiduciary duties, further underscoring

the need for equitable intervention.

213.    The raised amount of $1,020,100 from retail investors can be distinctly traced to the defendant's actions and subsequent misappropriation. This traceability provides a clear nexus between the diverted funds and the defendant's wrongful conduct, strengthening the basis for the imposition of an equitable remedy.

214.    The imposition of a constructive trust or equitable lien seeks to preserve assets that have been wrongfully obtained or retained. In this instance, imposing such a remedy would ensure that the defendant does not dissipate or unjustly benefit from the misappropriated funds, safeguarding the interests of the aggrieved investors.

215.    The defendant's calculated scheme, marked by intentional non-disclosures, diversion of funds, and neglect of investor interests, accentuates the gravity of the situation. Such egregious conduct not only warrants restitution but also underscores the imperative of an equitable remedy to rectify the wrongful enrichment and to ensure justice prevails.

216.    In conclusion, under California's esteemed legal traditions, the defendant's actions, characterized by unjust enrichment, breach of fiduciary duties, and intentional misappropriation, unequivocally establish a compelling cause of action for the imposition of a constructive trust or equitable lien. The aggrieved investors, having been unjustly deprived of their rightful assets, merit not only restitution but also the reaffirmation that both California and The United States maintain a commitment to equity, justice, and the protection of rights remains unyielding and steadfast.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly-situated, respectfully requests that the Court enter judgement in its favor and against Defendant and award the following relief:

1.    Requests that this Court:  Permanently enjoin Defendants Shumake, Jackson, Birch, and 420 Real Estate, their officers, agents, servants, employees, attorneys and those persons in  active concert or participation with Defendants who receive actual notice of the  order of this Court, by personal service or otherwise, and each of them from,  directly or indirectly, engaging in the transactions, acts, practices or courses of  business described above, or in conduct of similar purport and object, in violation  of Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 CFR § 240.10b 5]; and Section 5 of the Securities Act [15 U.S.C. § 77e];

2.       Permanently enjoin Defendants Petrescu and TruCrowd, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 4A of the Securities Act [15 U.S.C. § 77d–1] and Rules 300(c)(1) and 300(c)(3) thereunder [17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)];

3.       Ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

4.       Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

5.       Enter an Order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] permanently prohibiting Defendants Shumake, Jackson, and Birch from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 [15 U.S.C. § 78l] of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

6.       Actual damages for economic and non-economic harm in an amount to be determined at trial;

7.       Statutory damages in an amount to be determined at trial;

8.       Equitable relief in the form of monetary damages, restitution, and disgorgement;

9.       Pre-judgement interest;

10.      Post-judgment interest;

11.      Reasonable attorneys' fees and costs of suit incurred by their attorneys, in recognition of the spirit of the consumer protection statutes at issue, which encourage holding businesses to account for unfair business practices;

12.      Treble damages allowable under applicable laws;

13.      Punitive damages allowable under applicable laws;

14.    Exemplary damages allowable under applicable laws; and

15.    Grant any other relief this Court deems appropriate.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: December 23, 2023

Respectfully Submitted,

*Anthony Bell*

ANTHONY BELL (Bar No. 349401)
Superheroes At Law, P.C.
info@superheroesatlaw.com
8383 Wilshire Blvd, Suite 935
Beverly Hills, California 90211
855-694-3762
Attorney for Plaintiff

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

        **Plaintiff,**

        **v.**

**ROBERT SAMUEL SHUMAKE, JR.,
WILLARD L. JACKSON,
NICOLE T. BIRCH,
420 REAL ESTATE, LLC,
VICENT PETRESCU
aka VINCENT PETRESCU, and
TRUCROWD, INC. dba FUNDANNA,**

        **Defendants.**

**Case No.  21-cv-12193
Hon.**

**JURY TRIAL DEMANDED**

_____/

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"),

alleges as follows:

### SUMMARY OF ACTION

1.    The SEC brings this action to remedy two fraudulent crowdfunding

offerings conducted by Defendants Robert Samuel Shumake. Jr. ("Shumake"),

Willard L. Jackson ("Jackson"), and Nicole T. Birch ("Birch).

2.      The issuers of the securities that were fraudulently sold to members of the public were Defendant 420 Real Estate, LLC ("420 Real Estate") and a now defunct company named Transatlantic Real Estate, LLC ("Transatlantic Real Estate").

3.      Transatlantic Real Estate and 420 Real Estate raised funds through offerings on a crowdfunding platform hosted by Defendant TruCrowd, Inc. ("TruCrowd").  TruCrowd's CEO, Defendant Vicent Petrescu, aka Vincent Petrescu ("Petrescu"), was responsible for selecting which issuers could use TruCrowd's platform to conduct crowdfunding offerings.  Under the SEC's crowdfunding regulations, Petrescu and TruCrowd served as gatekeepers and, as such, were responsible for taking measures to reduce the risk of fraud.

4.      Shumake and Birch offered and sold securities of Transatlantic Real Estate from September 2018 through May 2019.  Shumake and Jackson offered and sold securities of 420 Real Estate from May 2019 through June 2020.

5.      Shumake was the driving force behind the both offerings, but he kept his participation secret in order to hide a past criminal conviction arising from a mortgage fraud scheme.  Shumake convinced Birch to act as the chief executive officer and sole member of Transatlantic Real Estate and convinced Jackson to act in the same roles for 420 Real Estate.

- 2 -

6.     Shumake, along with Birch and Jackson, marketed both offerings as opportunities for investors to share in bountiful profits from the cannabis industry, by acquiring real estate and leasing it to companies engaged in the business of growing cannabis.

7.     Shumake, Birch, and Jackson made multiple false and misleading representations and omissions to investors in connection with the crowdfunding offerings.  Among other things, they concealed Shumake's past criminal history and his leading role in both offerings.  And to make matters worse, they diverted hundreds of thousands of dollars from the offering proceeds for their personal benefit.  None of the money raised in either offering was used to acquire or improve cannabis real estate.  None of the investors in either crowdfunding offering has received any return on their investment, and few investors have recovered any of the funds they invested.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78aa(a)].

9.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15

U.S.C. § 78aa(a)], because many of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of this district.

10.    In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, have made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

## **DEFENDANTS**

11.    **Robert S. Shumake**, age 53, resides in Bloomfield Hills.  In December 2017, Shumake pled guilty to two misdemeanor violations of the Michigan Credit Services Protection Act, and on behalf of his business, to two felony counts of obtaining money by false pretense, for improperly taking upfront fees for mortgage audit services that he promised, but failed to deliver (*People v. Shumake*, et al., Mich. 46th Jud. Dist. (Feb. 15, 2017)).  The presiding court sentenced Shumake to a probationary period of 18 months, during which time Shumake was forbidden to work in a position where he could have "direct control over, or access to, another person's money."  Shumake ignored the terms of his probation sentence.  Before his probation ended in May 2019, he conducted the Transatlantic Real Estate offering with Birch and set in motion the 420 Real Estate offering with Jackson.  Shumake owns and controls Shumoja Media Group, LLC

("Shumoja"), a purported marketing services company, which received money in connection with the crowdfunding offerings.

12.    **Willard L. Jackson**, age 57, resides in Houston, Texas.  Jackson serves as the CEO and the sole director of 420 Real Estate.  Jackson previously served as a director of Bangi, Inc., described below.  Jackson also held ownership interests in WLJ Group, LLC and Ebony Media Holdings, LLC, (collectively, the "Jackson Entities").  Jackson facilitated the payment of money from the 420 Real Estate offering to the Jackson Entities.

13.    **Nicole T. Birch**, age 46, resides in Gainesville, Georgia.  Birch is a licensed attorney in Georgia and has her own law practice, H.B. Associates P.C. ("H.B. Associates").  Birch has served as CEO and sole director of both Transatlantic Real Estate and Bangi, Inc.  Birch facilitated the payment of money from the Transatlantic Real Estate offering to herself and to H.B. Associates.

14.    **420 Real Estate, LLC** is a Texas limited liability company formed in April 2019 with its principal place of business in Houston, Texas.  420 Real Estate purports to be a real estate company that specializes in the acquisition and leasing of properties that support the hemp industry.  420 Real Estate is owned by Willard Jackson.  420 Real Estate raised $888,180 through a crowdfunding offering between May 2019 and June 2020 ("420 Real Estate offering").

15.   **TruCrowd, Inc. dba Fundanna is** a Delaware corporation with its principal place of business in Chicago, Illinois.  TruCrowd is an SEC-registered funding portal for crowdfunding offerings.  TruCrowd hosted the crowdfunding offerings for Transatlantic Real Estate and 420 Real Estate through its platform.

16.   **Vicent Petrescu, aka Vincent Petrescu**, age 49, resides in Algonquin, Illinois.  Petrescu, a licensed CPA, is the founder and CEO of TruCrowd.  Petrescu granted Transatlantic Real Estate and 420 Real Estate access to TruCrowd's platform to conduct the crowdfunding offerings.

## RELATED ENTITIES

17.   **Transatlantic Real Estate, LLC** was a California limited liability company formed in August 2018 with its principal place of business in Grosse Pointe Farms.  Transatlantic Real Estate purported to be a real estate company that specialized in the acquisition and leasing of properties that support the medical cannabis industry.  Transatlantic Real Estate raised $1,020,100 through a crowdfunding offering between September 2018 and May 2019 ("Transatlantic Real Estate offering").  According to the offering statement for the Transatlantic Real Estate offering, Birch was the one hundred percent owner, CEO, chairman, and sole director of the company.  On July 9, 2021, Transatlantic Real Estate filed a Certificate of Cancellation with the California Secretary of State, which terminated its status as a limited liability company.

18.     **Bangi, Inc. ("Bangi")** is a Nevada corporation with its principal place of business in Grosse Pointe Farms.  Bangi is a publicly traded company that purports to specialize in the acquisition and leasing of properties that support the cannabis industry.  Bangi's common stock trades in the over-the-counter market under the symbol "BNGI."  According to Bangi's most recent SEC filing, Birch is the CEO of Bangi.

## FACTS

## Shumake Explores Various Means to Raise Money through Securities Offerings

19.     Following his guilty plea, but before the end of his probationary period and the court order prohibiting him from having access to other people's money, Shumake began taking steps to raise money from the public to enter the cannabis industries.  Ultimately, he pursued crowdfunding offerings as a means to raise funds.

20.     Crowdfunding offerings are governed by the securities transaction registration provisions of the Securities Act [17 U.S.C. §§ 77(a), *et seq.*] and Regulation Crowdfunding thereunder [17 C.F.R. § 227.100, *et seq.*].  From 2018 through 2020—the years relevant to this Complaint—these crowdfunding provisions allowed an unregistered offering of up to $1,070,000 through an intermediary, in this case, a funding portal registered under Rule 400 of Regulation

Crowdfunding.  Issuers could offer and sell their securities through the intermediary's platform on the internet.  Prior to the start of the crowdfunding offering, the issuer was required to file with the SEC a "Form C," and disclose certain information about the issuer and the offering through the Form C and offering statement.  For instance, issuers relying on the crowdfunding registration exemption were required to disclose, among other information, the names of all the issuer's officers, directors, and persons occupying a similar status or performing a similar function; the purpose and intended use of the offering proceeds; related-party transactions with the issuer's officers and promoters that are, in the aggregate, in excess of five percent of the aggregate capital that the issuer seeks to raise; and any material information necessary in order to make the statements made not misleading, in light of the circumstances under which they were made.  Regulation Crowdfunding also requires that the funding portal post the offering statement for each issuer on its internet platform so that all prospective investors have access to the same information relating to the issuer's offering.

21.    In September 2018, Shumake enlisted Birch, an attorney with whom he was in a personal relationship, to form Transatlantic Real Estate, with Birch holding the positions of CEO and sole member.  Shumake also convinced Birch to raise funds through a crowdfunding offering and to hide Shumake's involvement.

22.     Transatlantic Real Estate's mailing address was a UPS store in Grosse Pointe Farms, near where Shumake lived, rather than in Georgia where Birch lived.

23.     Shumake set up Bangi in November 2018, while he was working with Birch to conduct the Transatlantic Real Estate crowdfunding offering.  Bangi's address at the time was the same UPS store in Grosse Pointe Farms that Transatlantic Real Estate used.

24.     According to its website, Bangi "acquires specialized assets including hemp and cannabis farms, dispensaries, commercial real estate, industrial real estate, and leases real estate to the multi-billion dollar and growing cannabis industry."

25.     Shumake regularly attended and participated in Bangi Board meetings, gave direction to the company's officers and directors, and conducted business on behalf of Bangi.  Board minutes identify Shumake as the founder of Bangi.  Bangi Directors and Shumake discussed his criminal history and its potential impact on prospective investors.  Despite his involvement in the affairs of Bangi, Shumake elected not to serve as an officer or director of the company.  Nor was he listed on Bangi's website.

26.     Shumake explored the possibility of Bangi conducting an offering under SEC Regulation A+ [17 C.F.R. § 230.251, *et seq.*], which permitted higher

- 9 -

fundraising amounts than those allowed under Regulation Crowdfunding.
Ultimately, an offering for Bangi never occurred.

27.     In April 2019, Shumake enlisted Jackson, a friend and Bangi director,
to form 420 Real Estate, with Jackson as the CEO and sole member.  Shumake
convinced Jackson to utilize 420 Real Estate as a vehicle for raising funds through
a crowdfunding offering (the "420 Real Estate offering").  Shumake also
convinced Jackson to hide Shumake's involvement in the 420 Real Estate offering.

28.     Shumake discussed with Jackson his plans to use money raised
through the 420 Real Estate offering to fund Bangi.

29.     Shumake's name was not on any of the offering documents for
Transatlantic Real Estate or 420 Real Estate.  Shumake, Jackson, and Birch all
knew that the disclosure of Shumake's criminal past could hinder fundraising.
Therefore, they concealed Shumake's involvement, and Birch and Jackson falsely
held themselves out as the sole persons with authority over the offerings.

**The Transatlantic Real Estate Offering and Misuse of Investor Proceeds**

30.     Shumake arranged for TruCrowd to serve as the crowdfunding portal
for the Transatlantic Real Estate offering.

31.     Birch, with Petrescu's assistance, wrote the Transatlantic Real Estate
Form C and offering statement.  Birch and Petrescu kept Shumake informed about
the drafting process by copying him on substantive email discussions about the

- 10 -

offering statement.  Birch, Shumake, and Petrescu also each weighed in on the

steps necessary to kick off and promote the Transatlantic Real Estate offering to

investors.

32.     Transatlantic Real Estate filed the Form C and offering statement with

the SEC on September 12, 2018.  Birch signed the Form C as the company's sole

officer.

33.     The Form C and offering statement omitted any mention of

Shumake's involvement in the company or the offering.  Rather, to conceal

Shumake's criminal record, his name did not appear on any of the documents

associated with the Transatlantic Real Estate offering.  Birch falsely held herself

out as the sole person with authority over the company and the offering.

34.     Shumake and Birch knew that disclosure of Shumake's criminal past

could hinder fundraising.

35.     According to the Transatlantic Real Estate offering statement, the

company was a diversified investment vehicle that acquired and leased specialized

real estate assets.  Its strategy was to acquire industrial real estate that could be

used as medical cannabis cultivation facilities.

36.     The Transatlantic Real Estate offering statement represented that the

company was offering a maximum of 10,700 convertible notes for $100 each, and

that each subscription consisted of a "15% convertible Note . . . that mature[d]

eighteen months from the date of issuance, and, at [the] company's option, [was] convertible at a 10% discount into the public market."

37.     The Transatlantic Real Estate offering statement represented that, after expenses, the company intended to use the offering proceeds as follows: (1) $194,740 for marketing; (2) $97,370 for legal fees; (3) $584,220 for property improvement; and (4) $97,370 in administrative fees.

38.     The Transatlantic Real Estate offering statement contained several materially false and misleading statements, including the following:

    a.  Transatlantic Real Estate employed a senior management team that had significant experience in the real estate industry and sophisticated finance and capital markets expertise;

    b.  Transatlantic Real Estate had contingently acquired a 9-plus acre property with 80,000 Square Foot Green Houses located in California; and

    c.  Transatlantic Real Estate would use $584,220 of the proceeds for "property improvement."

    d.  Transatlantic Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital Transatlantic Real Estate intended to raise in the offering.

- 12 -

     e. Transatlantic Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."

39. All of these statements were false and misleading.

40. Transatlantic Real Estate never acquired any real estate and did not use any of the offering proceeds to purchase or improve any property.

41. As for the management of Transatlantic Real Estate, Birch had no experience in the real estate industry or sophisticated finance and capital markets expertise and did not employ any individuals, let alone a "team" with such experience on behalf of Transatlantic Real Estate.

42. The offering statement failed to disclose either Shumake's criminal record or that he would be actively involved in raising funds from investors and managing the company.

43. Shumake co-managed Transatlantic Real Estate with Birch and was extensively involved in the company's strategic decisions.  For instance, Shumake:

     a. directed communications with current and prospective investors;

     b. lined up a transfer agent for Transatlantic Real Estate;

     c. helped prepare documents and promote the offering;

     d. solicited Transatlantic Real Estate advertisements from third parties and drafted advertising scripts for social media; and

      e.   gave directions to Birch as to the disbursement of investor money

from Transatlantic Real Estate's bank account.

44.      From September 2018 through May 2019, Transatlantic Real Estate

raised $1,020,100 from approximately 2,000 investors in multiple states through

TruCrowd's platform.  The convertible notes that Transatlantic Real Estate offered

and sold to the investing public through TruCrowd were securities.

45.      Birch and Shumake diverted the investors' money for purposes

unrelated to Transatlantic Real Estate, including hundreds of thousands of dollars

transferred to Birch and her entity, H.B. Associates, and to Shumake and his entity,

Shumoja.

46.      Shumake and Birch diverted $358,311–or 35% of the total offering

proceeds—to Birch and her firm, H.B. Associates.

47.      Shumake and Birch diverted $304,709—or 30% of the total offering

proceeds—to Shumake and his company, Shumoja.

48.      The Transatlantic Real Estate offering statement disclosed the

possibility of related party transactions, but stated those transactions would be

"consistent with the duties of the management of the Company to its shareholders."

49.      Birch and Shumake did not use any investor funds to buy or improve

property.

- 14 -

50.     The Transatlantic Real Estate investors have not received any monetary return on their investment.

## The 420 Real Estate Offering and Misuse of Investor Proceeds

51.     Shumake arranged for TruCrowd to serve as the crowdfunding portal for the 420 Real Estate offering and put Jackson in touch with Petrescu.

52.     Jackson knew little about crowdfunding and relied on Shumake to take the necessary steps for 420 Real Estate to conduct its crowdfunding offering. Shumake told Jackson, a Bangi Director, about his plan to use the proceeds raised from the 420 Real Estate offering to fund Bangi.

53.     While Shumake was deeply involved in arranging the offering, he persuaded Jackson to hide Shumake's role with 420 Real Estate because of his criminal history.

54.     Petrescu and others participated in the drafting of the 420 Real Estate Form C and offering statement. Petrescu and others kept Jackson and Shumake informed about the drafting process by copying him on substantive email discussions about the Form C and offering statement.

55.     420 Real Estate filed its Form C and offering statement with the SEC on May 7, 2019. Jackson signed the Form C as the company's sole officer.

56.     The 420 Real Estate Form C and offering statement omitted any mention of Shumake's involvement in the company of the offering. Rather, to

conceal Shumake's criminal record, his name did not appear on any of the documents associated with the 420 Real Estate offering.  Jackson falsely held himself out as the sole person with authority over the company and the offering.

57.    Shumake and Jackson knew that disclosure of Shumake's criminal past could hinder fundraising.

58.    According to its offering statement, 420 Real Estate is a diversified investment vehicle that acquires and leases specialized real estate assets.  Its strategy is to acquire industrial real estate that can be used as hemp cultivation facilities.

59.    The 420 Real Estate offering statement represented that the company was offering a maximum of 10,700 convertible notes for $100 each, and that "each subscription consists of a 15% Convertible Note that mature[d] eighteen months from the date of issuance, and at the company's option, [was] convertible at a 10% discount into the public market."

60.    The 420 Real Estate offering statement represented that, after expenses, 420 Real Estate intended to use investor proceeds as follows: (1) $537,450 for marketing; (2) $97,370 for legal fees; (3) $278,960 for property; and (4) $97,370 in administrative fees.

61.    The 420 Real Estate offering statement did not mention Bangi or any intent to use the offering proceeds for Bangi.

62.     Nearly identical to the Transatlantic Real Estate offering statement, the 420 Real Estate offering statement contained several materially false and misleading statements, including the following:

   a.   420 Real Estate's employed a senior management team that has significant experience in all aspects of the real estate industry, including acquisitions, dispositions, leasing, development, management, and finance;

   b.   420 Real Estate would use $278,960 of the proceeds for "property improvement;"

   c.   420 Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital 420 Real Estate intended to raise in the offering; and

   d.   420 Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."

63.     All of these statements were false and misleading.

64.     420 Real Estate never used any offering proceeds for "property improvement."

- 17 -

65.     420 Real Estate did not have a senior management team—only Jackson and Shumake.  Jackson had no experience in the real estate industry. Shumake and Jackson concealed Shumake's criminal record and the fact that Shumake would be actively involved in raising funds from investors and managing the company.

66.     Money received from investors was deposited into an account managed by TruCrowd's escrow agent.  Rather than transferring the offering proceeds from the escrow agent directly to 420 Real Estate, Shumake arranged for the funds to be transferred to an account managed by an attorney he knew.  The attorney was responsible for disbursing the funds and took directions individually from Shumake and Jackson.

67.     Shumake co-managed 420 Real Estate with Jackson and was extensively involved in the company's strategic decisions.  For instance, Shumake:

    a.  directed communications with current and prospective investors;

    b.  helped prepare documents and promote the offering;

    c.  solicited advertisements from third parties and drafted advertising scripts for social media; and

    d.  gave directions to the attorney as to the disbursement of investor moneys.

- 18 -

68.     From May 2019 through June 2020, 420 Real Estate raised approximately $888,180 from the sale of convertible notes to approximately 2,000 investors in multiple states through the TruCrowd platform.  The convertible notes that 420 Real Estate offered and sold to the investing public through TruCrowd were securities.

69.     Pursuant to an agreement, Jackson and Shumake had to give their joint approval for all distributions of funds from the attorney.  In fact, however, Shumake and Jackson each individually directed the attorney to distribute the funds without the approval of the other.

70.     Jackson and Shumake diverted the investors' money for purposes unrelated to 420 Real Estate, including hundreds of thousands of dollars transferred to Shumake, Shumoja, Jackson, and the Jackson Entities.

71.     Shumake and Jackson diverted $280,608—or 32% of the total offering proceeds—to Jackson and the Jackson Entities.

72.     Shumake and Jackson diverted $114,029—or 13% of the total offering proceeds—to Shumake, Shumoja, and Bangi.

73.     Jackson and Shumake did not use any investor funds to buy or improve property.

74.     The 420 Real Estate investors have not received any monetary return on their investment.

- 19 -

## Petrescu and TruCrowd Allowed the Offerings to Proceed Despite Warning Signs of Fraud

75.     Petrescu owned and, as TruCrowd's owner and CEO, controlled the activities of TruCrowd.

76.     Petrescu, acting on behalf of TruCrowd, was responsible for selecting which issuers and individuals could use TruCrowd's platform to conduct crowdfunding offerings.

77.     Petrescu, acting on behalf of TruCrowd, engaged third party escrow agents to hold investor funds.

78.     In exchange for its services in connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, TruCrowd received $91,679 and $48,412, respectively.

79.     Petrescu, acting on behalf of TruCrowd, assisted issuers and their affiliated individuals with preparing and filing Forms C and offering statements.

80.     Petrescu, acting on behalf of TruCrowd, permitted the Transatlantic Real Estate and 420 Real Estate offerings to proceed despite multiple warning signs of possible fraud or other harm to investors.

81.     Petrescu, acting on behalf of TruCrowd, worked with both Shumake and Birch to file the Transatlantic Real Estate Form C and offering statement.

82.     According to Petrescu, Birch told him that she was the sole officer of Transatlantic Real Estate and that Shumake only provided marketing services. However, Shumake routinely coordinated with Petrescu to address non-marketing matters for the company, such as investor communications and lining up a transfer agent.

83.     Petrescu did not question why the Transatlantic Real Estate offering statement omitted any mention of Shumake's involvement with the company and the offering.

84.     In November 2018, two months after the Transatlantic Real Estate offering opened, Birch forwarded an email to Petrescu from an individual who had provided marketing services to Birch and Shumake in connection with the Transatlantic Real Estate offering.

85.     This individual's email to Birch and Shumake complained that they owed him money for services he had performed on the offering, stated that he had referred Transatlantic Real Estate for collections, and warned them of the potential impact of "SEC, Bad Actor Check."

86.     These emails required action by Petrescu, and through him, by TruCrowd.  Regulation Crowdfunding [17 C.F.R. §§227.301(c)] requires funding portals and their associated persons to conduct a background and securities enforcement regulatory history check (commonly referred to as a "bad actor"

check) on each issuer and the issuer's officers and directors (and any persons performing a similar function) to determine if they are subject to disqualification from participating in crowdfunding under Rule 503 of Regulation Crowdfunding, and to remove an offering from their platform if they become aware of information after they have granted access that causes them to reasonably believe that the issuer or the offering presents the potential for fraud or otherwise raises concerns about investor protection.

87.     Even after receiving this email, Petrescu never requested a bad actor check or ran a background check on Shumake.  If Petrescu had done so, he would have learned of Shumake's criminal history.

88.     A short time later, in December 2018, while the Transatlantic Real Estate offering was still raising funds from investors, Petrescu referred Birch and Shumake to an experienced securities attorney, to explore the possibility of a Regulation A offering for Bangi.

89.     The securities attorney emailed Petrescu on December 14, 2018, after meeting with Shumake and Birch:



From: ███████████████ >
Date: Friday, December 14, 2018 at 5:27 PM
To: "Vincent ████████████████
Subject: Robert Shumake
Hi Vincent,
I had the call with Robert and Nicole today. Confidentially, they seem to be good at marketing but
really have no industry experience. That was a red flag for me. I did a google search and found this
about Robert. I am going to pass.
Just wanted to let you know for your information.
https://www.google.com/amp/amp.fox2detroit.com/news/local-news/businessman-robert-shumake-
comes-to-court-but-not-alone
████████████
Managing Member

████████ PLLC

90.    The email linked to a 2017 news article, which discussed the criminal

charges filed by the Michigan Attorney General against Shumake and his business

Mortgage Auditors of America.  A few hours later, Petrescu replied:



To:         ████████████████████
From:      Vincent ███████████
Sent:       2018-12-14T18:40:27-05:00
Importance:          Normal
Subject:   Re: Robert Shumake
Received:            2018-12-14T18:40:25-05:00

;;;;;
Hi, ███
That does not look good.
I need to search some more.
Thanks for sharing!
Best,
V.
Vincent Petrescu, CPA
CEO, truCrowd, Inc

91.    The 2017 news article read, in part, as follows:

a. "[Michigan Attorney General] Schuette says Shumake was behind a scheme to cheat people who were trying to save their homes from Foreclosure."

b. "The attorney general's office investigated and recommended a warrant for Shumake's arrest in 2015, but Robert Shumake was in Africa."

c. "After filing for personal bankruptcy to the tune of more than $3 million, Shumake was busy posting on Facebook about his African humanitarian work and even turned up on the Tanzanian TV news as an American investor who ran a railroad."

d. "[L]ast year he was caught in California with $121,000 cash in his trunk and large sums of marijuana.  He's got an active arrest warrant in that case."

92.     Despite admitting that he needed "to search some more," Petrescu did not follow up on this red flag.  Instead, Petrescu allowed the Transatlantic Real Estate offering to continue on TruCrowd's platform.

93.     Then, in or about April 2019, Petrescu agreed to work with Shumake again and to host the 420 Real Estate offering on TruCrowd's portal.

94.     Petrescu however, did not request a bad actor check on Shumake or otherwise investigate Shumake's past before agreeing to host the 420 Real Estate offering.

95.     The 420 Real Estate offering statement was nearly identical to the Transatlantic Real Estate offering statement.

96.     Nevertheless, Petrescu did not question the representations in those documents that Jackson was the issuer's sole officer or the omission of any mention of Shumake's involvement with the issuer or the offering.

97.     During and after both the Transatlantic Real Estate offering and the 420 Real Estate offering, Petrescu, and through him TruCrowd, received a series of investor complaints about both the Transatlantic Real Estate and the 420 Real Estate offerings.  Investors asked whether the offerings were scams.  They complained to Petrescu that the issuers were not responding to inquiries.  Some investors complained that they had not received certificates for their investments.  Others asked for the refund of their investments.  All these emails should have raised questions for Petrescu whether the offerings presented the risk of fraud or investor harm, especially in light of the email exchanges described above.

98.     Petrescu's responses to the investor emails was to assure investors that the offerings were not scams, and to represent that he had run bad actor checks.

99.    Petrescu forwarded some of the investor complaints to Shumake, Jackson, and Birch.

100.    On April 16, 2020, Jackson informed Petrescu that Shumake had acted improperly.  Jackson told Petrescu that it is "very disappointing to learn that you took direction (without my knowledge) from Robert Shumake to redirect the approval of funds process for 420 Real Estate crowdfund.  He is not a party to my agreement with you or [TruCrowd]."  In a response on the same day copying Petrescu, Shumake stated that the 420 Real Estate offering was designed to support Bangi, Jackson's business, Ebony, and the "263k used by me to seed the operation."  Yet, this email did not prompt Petrescu to question why Bangi, Ebony, and payments to Shumake were omitted from the 420 Real Estate Form C and offering statement.

101.    On April 16, 2020, when Petrescu received Jackson's email, more than $20,000 of investor funds was being held in escrow.  Over the next several weeks, approximately $20,000 in additional investor money was invested and received into the escrow account.

102.    On June 8, 2020, Birch told Petrescu that Shumake had allowed a third party access to non-public information related to Transatlantic Real Estate investors, and instructed Petrescu that, going forward, he should only take

direction from Birch. Petrescu responded that, until recently, he understood Shumake to be a representative of Transatlantic Real Estate and Birch's agent.

103. Despite these red flags, Petrescu permitted the 420 Real Estate offering to proceed on the TruCrowd platform until it stopped accepting investors in June 2020.

104. Petrescu continued to work with Shumake after June 2020. He emailed Shumake about investor complaints. He also networked with Shumake in an effort to arrange a crowdfunding offering by at least one other issuer.

## COUNT I
### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]
### <u>(Shumake, Jackson, Birch and 420 Real Estate)</u>

105. Paragraphs 1 through 104 are realleged and incorporated by reference as though fully set forth herein.

106. By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of

business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

107.   Defendants Shumake, Jackson, Birch, and 420 Real Estate acted knowingly, recklessly, and/or negligently, in engaging in the conduct described above.

108.   By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**COUNT II**
**Violations of Section 10(b) of the Exchange Act**
**and Exchange Act Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]**
**(Shumake, Jackson, Birch and 420 Real Estate)**

109.   Paragraphs 1 through 10474 are realleged and incorporated by reference.

110.   By engaging in the conduct described above, Defendants Shumake, Jackson, Birch, and 420 Real Estate, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts,

practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

111.    Defendants Shumake, Jackson, Birch, and 420 Real Estate acted knowingly and/or recklessly, in engaging in the fraudulent conduct described above.

112.    Through the foregoing, Defendants Shumake, Jackson, Birch, and 420 Real Estate violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### COUNT III
#### Violations of Section 5(a) and (c) of the Securities Act
#### [15 U.S.C. § 77e(a) and (c)]
#### (Shumake and Birch as to Transatlantic Real Estate)

113.    Paragraphs 1 through 10474 are realleged and incorporated by reference.

114.    From in or about September 2018 through in or about June 2019, Defendants Shumake and Birch directly or indirectly, as to securities of Transatlantic Real Estate: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or

delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the SEC or being in effect as to such securities.

115.   No registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of Transatlantic Real Estate by Defendants Shumake and Birch, and no exemption from the registration requirements applied to Defendant Shumake's and Birch's sales.

116.   By engaging in the conduct described above, Defendants Shumake and Birch violated, and unless restrained and enjoined are reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**COUNT IV**
**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**(Shumake, Jackson and 420 Real Estate)**

117.   Paragraphs 1 through 10474 are realleged and incorporated by reference.

118.   From in or about July 2019 through in or about June 2020, Defendants Shumake, Jackson and 420 Real Estate, directly or indirectly, as to securities of Defendant 420 Real Estate: (a) made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to sell

securities through the use or medium of a prospectus or otherwise; or carried

securities or caused such securities to be carried through the mails or in interstate

commerce, by means or instruments of transportation, for the purpose of sale or

delivery after sale; and (b) made use of the means or instruments of transportation

or communication in interstate commerce or of the mails to offer to sell or to offer

to buy, through the use or medium of any prospectus or otherwise, securities

without a registration statement having been filed with the SEC or being in effect

as to such securities.

119.   No registration statements were filed with the SEC or were in effect in

connection with offers or sales of securities of Defendant 420 Real Estate by

Defendants Shumake, Jackson or 420 Real Estate, and no exemption from the

registration requirements applied to the sales by Defendant Shumake, Jackson, and

420 Real Estate.

120.   By engaging in the conduct described above, Defendants Shumake,

Jackson, and 420 Real Estate violated, and unless restrained and enjoined are

reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act

[15 U.S.C. §§ 77e(a) and (c)].

**COUNT V**
**Aiding and Abetting Violations of**
**Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**

- 31 -

**(Shumake)**

121.   Paragraphs 1 through 74 above74104 are realleged and incorporated by reference.

122.   As described above, Defendants Jackson and Birch, in the offer and sale of securities, respectfully, of 420 Real Estate and Transatlantic Real Estate, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

123.   By engaging in the conduct described, Defendants Jackson and Birch violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

124.    Defendant Shumake knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

125.   By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 17(a) of the Securities Act, by Defendants Jackson and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)],

Defendant Shumake is liable to the same extent as Defendants Jackson and Birch
for their violations of Section 17(a) of the Securities Act.

**COUNT VI**
**Aiding and Abetting Violations of**
**Section 10(b) of the Exchange Act**
**and Exchange Act Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]**
**(Shumake)**

126.   Paragraphs 1 through 10474 are realleged and incorporated by
reference.

127.   As described above, Defendants Jackson and Birch in connection with
the purchase and sale of securities, respectfully, of 420 Real Estate and
Transatlantic Real Estate, by the use of the means and instrumentalities of
interstate commerce and by the use of the mails, directly and indirectly, employed
devices, schemes and artifices to defraud; made untrue statements of material fact
and omitted to state material facts necessary in order to make the statements made,
in the light of the circumstances under which they were made, not misleading; and
engaged in acts, practices and courses of business which operated or would have
operated as a fraud and deceit upon purchasers and sellers and prospective
purchasers and sellers of securities.

128.   By engaging in the conduct described, Defendants Jackson and Birch
violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
thereunder [17 C.F.R. 240.10b-5].

129.   Defendant Shumake knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

130.   By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Defendants Jackson and Birch and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Shumake is liable to the same extent as Defendants Jackson and Birch for their violations of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### COUNT VII
### Aiding and Abetting Violations of
### Sections 5(a) and (c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and (c)]
### <u>(Shumake)</u>

131.   Paragraphs 1 through 104 are realleged and incorporated by reference.

132.   As described, Defendants Jackson and Birch offered and sold securities of, respectfully, 420 Real Estate and Transatlantic Real Estate, when no registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of either issuer, and no exemption from the registration requirements applied to Defendants' sales.

133.   By engaging in the conduct described, Defendants Jackson and Birch violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

134.    Defendant Shumake knowingly and/or recklessly provided substantial assistance to the unregistered offers and sales by Defendants Jackson and Birch.

135.    By reason of the foregoing, Defendant Shumake aided and abetted the violations of Section 5(a) and 5(c) of the Securities Act, by Defendants Jackson and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Shumake is liable to the same extent as Defendants Jackson and Birch for their violations of Sections 5(a) and (c) of the Securities Act.

## COUNT VIII
### Violations of Section 4A(a)(5) of the Securities Act and Rules 301(c)(2) Thereunder
### [15 U.S.C. § 77d–1(a)(5) and 17 C.F.R. 17 C.F.R. § 227.301(c)(2)]
### (Petrescu and TruCrowd)

136.    Paragraphs 1 through 104 are realleged and incorporated by reference.

137.    In connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, Defendant TruCrowd was an intermediary, and Petrescu was an associated person of an intermediary, for purposes of Section 4A of the Securities Act [15 U.S.C. § 77d–1]  and Rules 300(c)(1) and 300(c)(3) thereunder [17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)].

138.    As described above, Defendants Petrescu and TruCrowd allowed Defendants access to TruCrowd's crowdfunding platform in connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings.

139.   As described in Paragraphs 75 through 104, above, Defendants Petrescu and TruCrowd (1) had a reasonable basis for believing that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection; (2) reasonably believed, or should have reasonably believed, that they were unable to adequately or effectively assess the risk of fraud associated with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings; and (3) became aware of information, after they had granted access to the TruCrowd crowdfunding platform for the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, that caused them to reasonably believe, or in the exercise of reasonable care should have caused them to reasonably believe, that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection.

140.   As described above, Defendants Petrescu and TruCrowd failed to deny access to TruCrowd's crowdfunding platform and failed to promptly remove the Transatlantic Real Estate and 420 Real Estate offerings from TruCrowd's crowdfunding platform, cancel the offerings, and return and direct the return of any funds that had been committed by investors in the offerings.

141.   By reason of the foregoing, Defendants TruCrowd and Petrescu have violated, and unless restrained and enjoined are reasonably likely to continue to

violate, Section 4A(a)(5) of the Securities Act [15 U.S.C. § 77d–1(a)(5)] and Rule

301(c)(2) thereunder [17 C.F.R. § 227.301(c)(2)].

## **RELIEF REQUESTED**

**THEREFORE,** the SEC requests that this Court:

### I.

Permanently enjoin Defendants Shumake, Jackson, Birch, and 420 Real

Estate, their officers, agents, servants, employees, attorneys and those persons in

active concert or participation with Defendants who receive actual notice of the

order of this Court, by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices or courses of

business described above, or in conduct of similar purport and object, in violation

of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 CFR § 240.10b-

5]; and Section 5 of the Securities Act [15 U.S.C. § 77e];

### II.

Permanently enjoin Defendants Petrescu and TruCrowd, their officers,

agents, servants, employees, attorneys and those persons in active concert or

participation with Defendants who receive actual notice of the order of this Court,

by personal service or otherwise, and each of them from, directly or indirectly,

engaging in the transactions, acts, practices or courses of business described above,

or in conduct of similar purport and object, in violation of Section 4A of the

Securities Act [15 U.S.C. § 77d–1] and Rules 300(c)(1) and 300(c)(3) thereunder

[17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)];

### III.

Ordering Defendants to disgorge all ill-gotten gains and/or unjust

enrichment received directly or indirectly, with pre-judgment interest thereon, as a

result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and

21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

### IV.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)];

### V.

Enter an Order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)] permanently prohibiting Defendants Shumake, Jackson, and Birch

from serving as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 [15 U.S.C. § 78l] of the Exchange Act or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)]; and

## VI.

Grant any other relief this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

demands that this case be tried to a jury.

Dated:  September 20, 2021         Respectfully Submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

*s/John E. Birkenheier*
John E. Birkenheier, Illinois Bar No. 6270993
Jerrold H. Kohn, Illinois Bar No. 6188085
Dante A. Roldàn, Illinois Bar No. 6316972

U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
BirkenheierJ@sec.gov
KohnJ@sec.gov
RoldanD@sec.gov

Saima S. Mohsin, Acting United States Attorney
Peter A. Caplan, Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9784
P-30643
Peter.Caplan@usdoj.gov

*Attorneys for Plaintiff*

- 40 -

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

    **Plaintiff,**       **Case No. 21-cv-12193**
                **Hon. Arthur J. Tarnow**

    **v.**

**ROBERT SAMUEL SHUMAKE, JR.,**  **JURY TRIAL DEMANDED**
**WILLARD L. JACKSON,**
**NICOLE T. BIRCH,**
**420 REAL ESTATE, LLC,**
**VICENT PETRESCU**
**aka VINCENT PETRESCU, and**
**TRUCROWD, INC. dba FUNDANNA,**

    **Defendants.**

_____/

## FINAL JUDGMENT AS TO DEFENDANT NICOLE T. BIRCH

   The Securities and Exchange Commission having filed a Complaint and

Defendant Nicole T. Birch ("Defendant") having entered a general appearance;

consented to the Court's jurisdiction over Defendant and the subject matter of this

action; consented to entry of this Final Judgment without admitting or denying the

allegations of the Complaint (except as to jurisdiction and except as otherwise

provided herein in paragraph VIII); waived findings of fact and conclusions of law;

and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

2

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED
that Defendant is permanently restrained and enjoined from violating Section 5 of
the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any
applicable exemption:

(a)   Unless a registration statement is in effect as to a security, making use
      of any means or instruments of transportation or communication in
      interstate commerce or of the mails to sell such security through the
      use or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a security, carrying or
      causing to be carried through the mails or in interstate commerce, by
      any means or instruments of transportation, any such security for the
      purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of transportation or
      communication in interstate commerce or of the mails to offer to sell
      or offer to buy through the use or medium of any prospectus or
      otherwise any security, unless a registration statement has been filed
      with the Commission as to such security, or while the registration
      statement is the subject of a refusal order or stop order or (prior to the
      effective date of the registration statement) any public proceeding or
      examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Defendant is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $600,712, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $78,314, and a civil penalty in the amount of $200,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§ 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

Defendant shall satisfy this obligation by paying $879,026 to the Securities and

Exchange Commission  within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which

will provide detailed ACH transfer/Fedwire instructions upon request. Payment

may also be made directly from a bank account via Pay.gov through the SEC

website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by

certified check, bank cashier's check, or United States postal money order payable

to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number,

and name of this Court; Birch as a defendant in this action; and specifying that

payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of

payment and case identifying information to the Commission's counsel in this

action. By making this payment, Defendant relinquishes all legal and equitable

right, title, and interest in such funds and no part of the funds shall be returned to

Defendant.

The Commission may enforce the Court's judgment for disgorgement and

prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To

preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VI.

Birch shall pay the total of disgorgement, prejudgment interest, and penalty due of $879,026 to the Commission within 30 days of entry of this Final Judgment. Payments shall be deemed made on the date they are received by the Commission and shall be applied first to post judgment interest, which accrues pursuant to 28

8

U.S.C. § 1961 on any unpaid amounts due after 30 days of the entry of Final

Judgment. Prior to making the final payment set forth herein, Birch shall contact

the staff of the Commission for the amount due for the final payment.

       If Birch fails to make any payment by the date agreed and/or in the

amount agreed according to the schedule set forth above, all outstanding payments

under this Final Judgment, including post-judgment interest, minus any payments

made, shall become due and payable immediately at the discretion of the staff of

the Commission without further application to the Court.

VII.

       IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the

Consent is incorporated herein with the same force and effect as if fully set forth

herein, and that Defendant shall comply with all of the undertakings and

agreements set forth therein.

VIII.

       IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely

for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy

Code, 11 U.S.C. §523, the allegations in the complaint are true and admitted by

Defendant, and further, any debt for disgorgement, prejudgment interest, civil

penalty or other amounts due by Defendant under this Final Judgment or any other

judgment, order, consent order, decree or settlement agreement entered in

9

connection with this proceeding, is a debt for the violation by Defendant of the

federal securities laws or any regulation or order issued under such laws, as set

forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this

Court shall retain jurisdiction of this matter for the purposes of enforcing the terms

of this Final Judgment.

X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment

forthwith and without further notice.

Dated: December 23, 2021

s/Arthur J. Tarnow
UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

           **Plaintiff,**                    **Case No. 21-cv-12193**
                                                **Hon. Arthur J. Tarnow**

           **v.**

**ROBERT SAMUEL SHUMAKE, JR.,**        **JURY TRIAL DEMANDED**
**WILLARD L. JACKSON,**
**NICOLE T. BIRCH,**
**420 REAL ESTATE, LLC,**
**VICENT PETRESCU**
**aka VINCENT PETRESCU, and**
**TRUCROWD, INC. dba FUNDANNA,**

           **Defendants.**

_____/

### FINAL JUDGMENT AS TO DEFENDANT VICENT PETRESCU

    The Securities and Exchange Commission having filed a Complaint and

Defendant Vicent Petrescu aka Vincent Petrescu ("Defendant") having entered a

general appearance; consented to the Court's jurisdiction over Defendant and the

subject matter of this action; consented to entry of this Final Judgment without

admitting or denying the allegations of the Complaint (except as to jurisdiction and

except as otherwise provided herein in paragraph V); waived findings of fact and

conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 4A of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77d] and Rule 301(c)(2) [17 C.F.R. § 227.301] promulgated thereunder by, directly or indirectly, when acting as an intermediary or person associated with an intermediary, allowing issuers access to a crowdfunding platform in connection with crowdfunding offerings, when they: (1) have a reasonable basis for believing that the crowdfunding offerings present the potential for fraud or otherwise raise concerns about investor protection; (2) reasonably believe, or should reasonably believe, that they are unable to adequately or effectively assess the risk of fraud associated with the crowdfunding offerings; or (3) become aware of information, after they have granted issuers access to a crowdfunding platform for crowdfunding offerings, that cause them to reasonably believe, or in the exercise of reasonable care should cause them to reasonably believe, that the crowdfunding offerings present the potential for fraud or otherwise raise concerns about investor protection; and (4) fail to deny the issuers access to a crowdfunding platform or fail to promptly remove the offerings from a crowdfunding platform, cancel the offerings, and return and direct the return of any funds that had been committed by investors in the offerings.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $9,700 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]. Defendant shall satisfy this obligation by paying $9,700 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number,

and name of this Court; Petrescu as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order

4

of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

III.

Defendant shall pay the penalty due of $9,700 to the Commission within 30 days of entry of this Final Judgment. Payments shall be deemed made on the date they are received by the Commission and shall be applied first to post judgment interest, which accrues pursuant to 28 U.S.C. § 1961 on any unpaid amounts due after 30 days of the entry of Final Judgment. Prior to making the final payment set forth herein, Petrescu shall contact the staff of the Commission for the amount due for the final payment.

If Defendant fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Final Judgment, including post-judgment interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Court.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: December 23, 2021

s/Arthur J. Tarnow
UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                **Plaintiff,**                    **Case No. 21-cv-12193**
                                                    **Hon. Arthur J. Tarnow**

                **v.**

**ROBERT SAMUEL SHUMAKE, JR.,**         **JURY TRIAL DEMANDED**
**WILLARD L. JACKSON,**
**NICOLE T. BIRCH,**
**420 REAL ESTATE, LLC,**
**VICENT PETRESCU**
**aka VINCENT PETRESCU, and**
**TRUCROWD, INC. dba FUNDANNA,**

                **Defendants.**

_____/

## FINAL JUDGMENT AS TO DEFENDANT TRUCROWD, INC.

The Securities and Exchange Commission having filed a Complaint and

Defendant TruCrowd, Inc. ("Defendant") having entered a general appearance;

consented to the Court's jurisdiction over Defendant and the subject matter of this

action; consented to entry of this Final Judgment without admitting or denying the

allegations of the Complaint (except as to jurisdiction); waived findings of fact and

conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 4A of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77d] and Rule 301(c)(2) [17 C.F.R. § 227.301] promulgated thereunder by, directly or indirectly, when acting as an intermediary or person associated with an intermediary, allowing issuers access to a crowdfunding platform in connection with crowdfunding offerings, when they: (1) have a reasonable basis for believing that the crowdfunding offerings present the potential for fraud or otherwise raise concerns about investor protection; (2) reasonably believe, or should reasonably believe, that they are unable to adequately or effectively assess the risk of fraud associated with the crowdfunding offerings; or (3) become aware of information, after they have granted issuers access to a crowdfunding platform for crowdfunding offerings, that cause them to reasonably believe, or in the exercise of reasonable care should cause them to reasonably believe, that the crowdfunding offerings present the potential for fraud or otherwise raise concerns about investor protection; and (4) fail to deny the issuers access to a crowdfunding platform or fail to promptly remove the offerings from a crowdfunding platform, cancel the offerings, and return and direct the return of any funds that had been committed by investors in the offerings.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also
binds the following who receive actual notice of this Final Judgment by personal
service or otherwise: (a) Defendant's officers, agents, servants, employees, and
attorneys; and (b) other persons in active concert or participation with Defendant
or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED
that Defendant is liable for disgorgement of $129,380, representing net profits
gained as a result of the conduct alleged in the Complaint, together with
prejudgment interest thereon in the amount of $16,867, and a civil penalty in the
amount of $97,500 pursuant to Section 20(d) of the Securities Act [15 U.S.C.
§ 77t(d)]. Defendant shall satisfy this obligation by paying $243,747 to the
Securities and Exchange Commission within 30 days after entry of this Final
Judgment.

Defendant may transmit payment electronically to the Commission, which
will provide detailed ACH transfer/Fedwire instructions upon request. Payment
may also be made directly from a bank account via Pay.gov through the SEC
website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by
certified check, bank cashier's check, or United States postal money order payable

to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; TruCrowd, Inc. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of

this Final Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this

action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

III.

Defendant shall pay the total of disgorgement, prejudgment interest, and penalty due of $243,747 to the Commission within 30 days of entry of this Final Judgment. Payments shall be deemed made on the date they are received by the Commission and shall be applied first to post judgment interest, which accrues pursuant to 28 U.S.C. § 1961 on any unpaid amounts due after 30 days of the entry of Final Judgment. Prior to making the final payment set forth herein, TruCrowd, Inc. shall contact the staff of the Commission for the amount due for the final payment.

If Defendant fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Final Judgment, including post-judgment interest, minus any payments

6

made, shall become due and payable immediately at the discretion of the staff of

the Commission without further application to the Court.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the

Consent is incorporated herein with the same force and effect as if fully set forth

herein, and that Defendant shall comply with all of the undertakings and

agreements set forth therein.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this

Court shall retain jurisdiction of this matter for the purposes of enforcing the terms

of this Final Judgment.

VI.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment

forthwith and without further notice.

Dated: December 23, 2021

s/Arthur J. Tarnow
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

## UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 93882 / December 30, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20692**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **In the Matter of** | : | **ORDER INSTITUTING** |
| | : | **PUBLIC ADMINISTRATIVE** |
| | : | **PROCEEDINGS PURSUANT TO RULE** |
| **NICOLE T. BIRCH, Esq.,** | : | **102(e) OF THE COMMISSION'S RULES OF** |
| | : | **PRACTICE, MAKING FINDINGS, AND** |
| **Respondent.** | : | **IMPOSING REMEDIAL SANCTIONS** |
| | : | |
| | : | |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted against Nicole T. Birch ("Respondent" or "Birch") pursuant to Rule 102(e)(3)(i) of the Commission's Rules of Practice.[1]

### II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over her and the subject matter of these proceedings, and the findings contained in Section III.2 below, which are admitted, Respondent consents to the entry of

---

[1] Rule 102(e)(3)(i) provides, in relevant part, that:

The Commission, with due regard to the public interest and without preliminary hearing, may, by order, . . . suspend from appearing or practicing before it any attorney . . . who has been by name (A) [p]ermanently enjoined by any court of competent jurisdiction, by reason of his or her misconduct in an action brought by the Commission, from violating or aiding and abetting the violation of any provision of the Federal securities laws or of the rules and regulations thereunder; or (B) [f]ound by any court of competent jurisdiction in an action brought by the Commission to which he or she is a party … to have violated (unless the violation was found not to have been willful) or aided and abetted the violation of any provision of the Federal securities laws or of the rules and regulations thereunder.

this Order Instituting Administrative Proceedings Pursuant to Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:

1.     Birch, age 46, resides in Gainesville, Georgia. Birch is a member of the Georgia State Bar. Birch has never held any securities licenses and is not registered with the Commission in any capacity.

2.     On September 20, 2021, the Commission filed a complaint against Birch in *SEC v. Robert Samuel Shumake, Jr., et al.* (Civil Action No. 21-cv-12193), in the United States District Court for the Eastern District of Michigan. On December 23, 2021, the court entered an order permanently enjoining Birch, by consent, from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

3.     The Commission's complaint alleged, among other things, that Birch, along with others, conducted a fraudulent and unregistered crowdfunding offering through a cannabis company, raising over $1 million from thousands of investors. Birch, with the assistance of others, prepared the offering statement for the company which misrepresented the use of proceeds from the offering. In addition, the offering statement falsely stated that the company employed an experienced management team and that it had contingently acquired certain real estate. The offering statement also omitted the significant involvement in the offering of an individual with a past criminal conviction. Finally, Birch diverted offering proceeds to herself and to her law firm.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanction agreed to in Respondent Birch's Offer.

Accordingly, it is hereby ORDERED pursuant to Rule 102(e)(3)(i) of the Commission's Rules of Practice, effective immediately, that:

Birch is suspended from appearing or practicing before the Commission as an attorney.

By the Commission.

Vanessa A. Countryman
Secretary

2

# EXHIBIT 6

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 93884 / December 30, 2021**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4278 / December 30, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20693**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **In the Matter of** | : | **ORDER INSTITUTING** |
| | : | **PUBLIC ADMINISTRATIVE** |
| | : | **PROCEEDINGS PURSUANT TO RULE** |
| **Vicent C. Petrescu, aka Vincent** | : | **102(e) OF THE COMMISSION'S RULES OF** |
| **Petrescu, CPA,** | : | **PRACTICE, MAKING FINDINGS, AND** |
| | : | **IMPOSING REMEDIAL SANCTIONS** |
| **Respondent.** | : | |
| | : | |
| | : | |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted against Vicent C. Petrescu, aka Vincent Petrescu, CPA ("Respondent" or "Petrescu") pursuant to Rule 102(e)(3)(i) of the Commission's Rules of Practice.[1]

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, and the

---

[1] Rule 102(e)(3)(i) provides, in relevant part, that:

The Commission, with due regard to the public interest and without preliminary hearing, may, by order, . . . suspend from appearing or practicing before it any . . . accountant . . . who has been by name . . . permanently enjoined by any court of competent jurisdiction, by reason of his or her misconduct in an action brought by the Commission, from violating or aiding and abetting the violation of any provision of the Federal securities laws or of the rules and regulations thereunder.

findings contained in Section III.2 below, which are admitted, Respondent consents to the entry of this Order Instituting Administrative Proceedings Pursuant to Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:

1.     Petrescu, age 49, resides in Algonquin, Illinois. Petrescu has held an active CPA license in Illinois since October 2018. Petrescu also held a CPA license in Indiana that expired in June 2021. As of August 2021, Petrescu owns an accounting firm, CPA Wit, LLC, an Illinois limited liability company. Petrescu is the founder and CEO of TruCrowd, Inc. ("TruCrowd"), an SEC-registered funding portal.

2.     On September 20, 2021, the Commission filed a complaint against Petrescu in *SEC v. Robert Samuel Shumake, Jr., et al.* (Civil Action No. 21-cv-12193), in the United States District Court for the Eastern District of Michigan. On December 23, 2021, the court entered an order permanently enjoining Petrescu, by consent, from future violations of Section 4A(a)(5) of the Securities Act of 1933 and Rule 301(c)(2) thereunder.

3.     The Commission's complaint alleged, among other things, that Petrescu permitted two issuers to conduct fraudulent crowdfunding offerings through TruCrowd's platform despite multiple warning signs of possible fraud or other harm to investors. Petrescu assisted these issuers and their affiliated individuals with preparing and filing Forms C and offering statements. Petrescu never questioned why the Forms C and offering statements omitted any mention of another individual with a criminal record who was actively involved with the offerings and the management of the issuers. Petrescu also failed to address a series of red flags concerning possible fraud and investor harm, including but not limited to complaints and concerns raised by investors, an attorney, and individuals affiliated with the issuers.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanction agreed to in Respondent Petrescu's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that**:**

A.     Petrescu is suspended from appearing or practicing before the Commission as an accountant.

B.     After three years from the date of the Order, Respondent may request that the Commission consider Respondent's reinstatement by submitting an application to the attention of the Office of the Chief Accountant.

C.      In support of any application for reinstatement to appear and practice before the Commission as a preparer or reviewer, or a person responsible for the preparation or review, of financial statements of a public company to be filed with the Commission, other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934 ("Exchange Act"), Respondent shall submit a written statement attesting to an undertaking to have Respondent's work reviewed by the independent audit committee of any public company for which Respondent works or in some other manner acceptable to the Commission, as long as Respondent practices before the Commission in this capacity and will comply with any Commission or other requirements related to the appearance and practice before the Commission as an accountant.

D.      In support of any application for reinstatement to appear and practice before the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, as a preparer or reviewer, or as a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission, Respondent shall submit a statement prepared by the audit committee(s) with which Respondent will be associated, including the following information:

   1.   A summary of the responsibilities and duties of the specific audit committee(s) with which Respondent will be associated;

   2.   A description of Respondent's role on the specific audit committee(s) with which Respondent will be associated;

   3.   A description of any policies, procedures, or controls designed to mitigate any potential risk to the Commission by such service;

   4.   A description relating to the necessity of Respondent's service on the specific audit committee; and

   5.   A statement noting whether Respondent will be able to act unilaterally on behalf of the Audit Committee as a whole.

E.      In support of any application for reinstatement to appear and practice before the Commission as an independent accountant (auditor) before the Commission, Respondent must be associated with a public accounting firm registered with the Public Company Accounting Oversight Board (the "PCAOB") and Respondent shall submit the following additional information:

   1.   A statement from the public accounting firm (the "Firm") with which Respondent is associated, stating that the firm is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002;

   2.   A statement from the Firm with which the Respondent is associated that the Firm has been inspected by the PCAOB and that the PCAOB did not identify

3

any criticisms of or potential defects in the Firm's quality control system that would indicate that Respondent will not receive appropriate supervision; and

3.  A statement from Respondent indicating that the PCAOB has taken no disciplinary actions against Respondent since seven (7) years prior to the date of the Order other than for the conduct that was the basis for the Order.

F.    In support of any application for reinstatement, Respondent shall provide documentation showing that Respondent is currently licensed as a certified public accountant ("CPA") and that Respondent has resolved all other disciplinary issues with any applicable state boards of accountancy.  If Respondent is not currently licensed as a CPA, Respondent shall provide documentation showing that Respondent's licensure is dependent upon reinstatement by the Commission.

G.    In support of any application for reinstatement, Respondent shall also submit a signed affidavit truthfully stating, under penalty of perjury:

1.    That Respondent has complied with the Commission suspension Order, and with any related orders and undertakings, including any orders in *SEC v. Robert Samuel Shumake, Jr., et al.* (Civil Action No. 21-cv-12193), in the United States District Court for the Eastern District of Michigan, or any related Commission proceedings, including any orders requiring payment of disgorgement or penalties;

2.    That Respondent undertakes to notify the Commission immediately in writing if any information submitted in support of the application for reinstatement becomes materially false or misleading or otherwise changes in any material way while the application is pending;

3.    That Respondent, since the entry of the Order, has not been convicted of a felony or a misdemeanor involving moral turpitude that would constitute a basis for a forthwith suspension from appearing or practicing before the Commission pursuant to Rule 102(e)(2);

4.    That Respondent, since the entry of the Order:

a.    has not been charged with a felony or a misdemeanor involving moral turpitude as set forth in Rule 102(e)(2) of the Commission's Rules of Practice, except for any charge concerning the conduct that was the basis for the Order;

b.    has not been found by the Commission or a court of the United States to have committed a violation of the federal securities laws, and has not been enjoined from violating the federal securities laws, except for any

4

finding or injunction concerning the conduct that was the basis for the Order;

c.  has not been charged by the Commission or the United States with a violation of the federal securities laws, except for any charge concerning the conduct that was the basis for the Order;

d.  has not been found by a court of the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, or any bar thereof to have committed an offense (civil or criminal) involving moral turpitude, except for any finding concerning the conduct that was the basis for the Order; and

e.  has not been charged by the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, civilly or criminally, with having committed an act of moral turpitude, except for any charge concerning the conduct that was the basis for the Order.

5.  That Respondent's conduct is not at issue in any pending investigation of the Commission's Division of Enforcement, the PCAOB's Division of Enforcement and Investigations, any criminal law enforcement investigation, or any pending proceeding of a State Board of Accountancy, except to the extent that such conduct concerns that which was the basis for the Order.

6.  That Respondent has complied with any and all orders, undertakings, or other remedial, disciplinary, or punitive sanctions resulting from any action taken by any State Board of Accountancy, or other regulatory body.

H.  Respondent shall also provide a detailed description of:

1.  Respondent's professional history since the imposition of the Order, including

    (a) all job titles, responsibilities and role at any employer;

    (b) the identification and description of any work performed for entities regulated by the Commission, and the persons to whom Respondent reported for such work; and

2.  Respondent's plans for any future appearance or practice before the Commission.

I.  The Commission may conduct its own investigation to determine if the foregoing attestations are accurate.

5

J.      If Respondent provides the documentation and attestations required in this Order and the Commission (1) discovers no contrary information therein, and (2) determines that Respondent truthfully and accurately attested to each of the items required in Respondent's affidavit, and the Commission discovers no information, including under Paragraph I, indicating that Respondent has violated a federal securities law, rule or regulation or rule of professional conduct applicable to Respondent since entry of the Order (other than by conduct underlying Respondent's original Rule 102(e) suspension), then, unless the Commission determines that reinstatement would not be in the public interest, the Commission shall reinstate the respondent for cause shown.

K.      If Respondent is not able to provide the documentation and truthful and accurate attestations required in this Order or if the Commission has discovered contrary information, including under Paragraph I, the burden shall be on the Respondent to provide an explanation as to the facts and circumstances pertaining to the matter setting forth why Respondent believes cause for reinstatement nonetheless exists and reinstatement would not be contrary to the public interest. The Commission may then, in its discretion, reinstate the Respondent for cause shown.

L.      If the Commission declines to reinstate Respondent pursuant to Paragraphs J and K, it may, at Respondent's request, hold a hearing to determine whether cause has been shown to permit Respondent to resume appearing and practicing before the Commission as an accountant.


By the Commission.



Vanessa A. Countryman
Secretary




6

**From:** Dr. Neil Parsan <nparsan@gmail.com>
**Sent:** Saturday, April 18, 2020 8:47 AM
**To:** Robert <robshumake@gmail.com>; Willard Jackson <wjackson@cvggroupllc.com>; Hill Harper <hillharper@gmail.com>; mathew.knowles@musicworldent.com; Rick Shykora <rshykora@shaw.ca>; nbirch@hbassociateslaw.com
**Subject:** Questions from the Board of Directors, Resignation _ Neil Parsan.

Dear Robert/ Board of Directors/ Officers

Robert - the Board of Directors has instructed me to ask the following questions as regards your conduct in the affairs of BANGI.

I will appreciate a response to all copied on this email in their respective capacities.

*Where is the money from the check given to Robert from Matthew? Based on attached I see Willard Jackson was paid 20K for referral - referral for what? Is there a contract? Can we see it? Nicole Birch as paid legal fees - Is there a contract for this and her engagement as an attorney to the firm? What is her role in BANGI Inc?; Are there contracts/agreements for the other payees? Can we see them please. I was paid 5CK as EO - for transparency to all this is in attached contract.*

*What other bank accounts have been set up in the name of Bangi or Bangi related name(s)?*

*Where is the proxy regarding Nicole Birch?*

*Where are the funds raised from crowd funding? for 420 with Willard JAckson -how much money was paid to him? did any resources come to BANGI? I was told by you that this went to Ebony? Is this accurate? where is the evidence to support this?*

*What has been payed out for events, marketing etc.?*

*What promises or offers or money or equity was offered to RayJ (and Matthew) for their participation?*

*What banks have accounts related or any way associated with Bangi?*

*What expenses have been paid out in the name of Bangi and to whom for what? Full report required.*

*Where is the money from the initial investor pool? The Company raised close to or over $1 million through a crowdfunding offering over a year ago through the investments of approximately 2,000 various individual investors. Is this accurate? Where were the funds deposited upon completion of this offering and who had access to the funds?*

*How were the funds spent and with who's approval?*

*How do you intend on repaying the original BANGI investors?*

*Outline the deal made with Rick (Canada). What was paid to him or promised made?*

*Where has money been spent for marketing, salaries, travel or any other expenses?*

*How much cash or stock have the directors/you been compensated thus far for your services? How much has been promised for your future services? May we see all employment contracts with BANGI? See attached document for further clarification of your responses.*
*Can you tell us how much cash BANGI had on its books at the end of its most recent fiscal year? Who does know this or other financial figures and why are they not periodically provided to the CEO/BoD for inspection and guidance?*
*How many times a quarter do you review the Company's financial statements, including its income statement, cash flow statement and balance sheet?*
*Which members of management either bought or sold BANGI stock over the past 12 months?*

*Do you believe you overall strategy for BANGI would label you as a "control" person?*
*Did Mr. Shumake sell any stock during the past 12 months? How much? Where and how were the funds used?*
*What is his relationship with River Ridge?*
*How much due diligence did you personally do before approving the issuance of press releases ranging from the listing on an African exchange to the acquisition of a Michigan property? Would BANGI shortly announce the acquisition of a property in Jamaica that could provide enough revenue to enable BANGI to become self-sufficient?*

*What is relationship between BANGI, Ebony, Ebony Foundation?*

It was also brought to my attention that the Auditor has pulled the BANGI Reg A application. *Is this correct? Why was the Board, who collectively took the decision to proceed with this application was not so informed? When was this done?*

I will appreciate a full response to the above questions to the persons copied.

**Rick - in your capacity as Board Secretary, I am requesting that you release ALL BOARD MEETING MINUTES to all in copy. Have them fully ready for public scrutiny as they should always be.**

On a personal note, it is sad that personal relationships and friendships have affected the firm in this manner. The firm has great potential that has not been able to be realized to date due to the lack of transparency, accountability to the Board and side dealings with others.

Based on the above, I am resigning with immediate effect. I can no longer sit by and watch the foul-play, backstabbing and ill-intent that certain members of this team are engaged in to the detriment and well-being of the firm and its investors. Selfishness, dishonesty, underhandedness and greed has overshadowed truth, hard-work and togetherness in getting a good job done.

As I leave let me state categorically: **I HAD NO CONTROL OVER THE AFFAIRS OF THIS FIRM AS YOU ALL HAVE SAID TO ME IN BOARD MEETINGS, PRIVATE CALLS AND AT EVERY OPPORTUNITY. ALL DECISIONS I HAVE BEEN INVOLVED IN WAS UNDER THE GUIDANCE AND DEMOCRATIC PROCESS OF A BOARD OF DIRECTORS. THE DAY-TO-DAY MANAGEMENT OF BANGI INC. WAS UNDER THE FULL CONTROL OF ROBERT SHUMAKE AS EVIDENCED IN ALL EMAILS, DIGITAL COMMUNICATIONS ETC.**

1. I have had no access to any BANGI INC. bank account

2. My name was on one miscellaneous account registered with WellsFargo Acct under BANGI OPERATIONS LLC. – explained to me as the account that will be used to pay for miscellaneous expenses such as ground transportation, firm based travel and contractor fees. The account was more often than not in overdraft thus affecting my personal credit score despite my attempts to have this resolved

3. I am not aware of the CASH position of BANGI INC. at the end of the last financial year. I have not been provided the executed and signed Financial Statements for review. I have seen what the CPA has issued for filing.

4. I do not have access to any funds raised by BANGI INC.

5. I have had no dealings in matters relating to Human Resource matters in BANGI INC.

6. I have received NO STOCK as compensation for my services to date. The original letter of offer indicated a stock amount with no stock certificate or any authentication of same being received by the undersigned

7. I am not aware or was made aware of any activity of Members of the Board or management team who either bought or sold BANGI INC. stocks over the last 12 month period.

**If the above questions are not satisfactorily responded to by COB Monday, I will be engaging my attorneys and I will issue a full press release based on the above.**

Respectfully always,

**Ambassador (Ret.) Dr. Neil Parsan**

---

**4 attachments**

📄 **BANGI BOD RES Accepting Resignation of NP_Appointment of NB_Executed.pdf**
211K

📄 **Bangi_Board of Directors Thank You_HARPER_Executed.pdf**
209K